IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

COFFEYVILLE RESOURCES REFINING          )
& MARKETING, LLC,                       )
                                        )
                    Plaintiff,          )
                                        )
v.                                      )          No.  08-1204-WEB-KMH
                                        )
LIBERTY SURPLUS INSURANCE               )
CORPORATION,                            )
                                        )
ILLINOIS UNION INSURANCE COMPANY,       )
                                        )
NATIONAL UNION FIRE INSURANCE           )
COMPANY OF PITTSBURGH, PA., and         )
                                        )
WESTCHESTER FIRE INSURANCE              )
COMPANY,                                )
                                        )
                    Defendants.         )
_____)

## Memorandum and Order

        This dispute arises out of a flood of the Verdigris River on June 30, 2007.  During the

flood, a large amount of crude oil from plaintiff's oil refinery was released into flood waters and

was carried into Coffeyville, Kansas, resulting in widespread damage to homes and businesses.

Plaintiff has now allegedly spent over $50 million as a result of the release.  In this action,

plaintiff claims the defendants have breached obligations to indemnify it under various liability

insurance policies.[1]  The matter is before the court on several pending summary judgment

motions.  Subject matter jurisdiction is appropriate in this court based upon diversity of

citizenship. *See* 28 U.S.C. § 1332(a).

_____

        [1] By stipulation, the claims against defendant Liberty Surplus Insurance Corporation have
since been dismissed with prejudice.  Doc. 45.

Counsel in this case have done a substantial amount of work.  Unfortunately, the briefs make it somewhat difficult to address the issues in concise fashion.  Plaintiff's initial motion for summary judgment was based in part on an affidavit from plaintiff's general counsel which contained a number of assertions not shown to be based on the witness's personal knowledge, although many of the assertions otherwise appeared in the record.  This in turn led to motions to strike, responses, replies, and sur-replies, and a generally contentious state of affairs.  The issues are now dispersed among a multitude of briefs, with many arguments and  factual assertions incorporated from one brief to another.  It has taken the court a good deal of time to sort through the briefs.  Although there was a request for oral argument, the court is now prepared to rule and concludes that oral argument would not materially assist in deciding the issues presented.

The following motions are now before the court: National Union's Motion for Summary Judgment (Doc. 77), Coffeyville Resources' Motion for Partial Summary Judgment (Doc. 81), Illinois Union's Motion for Summary Judgment (Doc. 83), and National Union's Motion for Partial Summary Judgment (Doc. 141).  The standards for summary judgment are well-established.  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  A disputed fact is "material" if it might affect the outcome of the suit under the governing law.  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Because it is the role of a jury to resolve conflicts in the evidence, on summary judgment the court must examine the factual record and draw all reasonable inferences in the light most favorable to the nonmoving party.

2

*Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir.2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Thus, "[w]here different ultimate inferences may properly be drawn, the case is not one for a summary judgment." *Seamons*, 206 F.3d at 1026.

Under Rule 56, the moving party initially bears the burden of making a prima facie showing of the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law. *See Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir .1998). This burden may be satisfied by pointing to an absence of evidence on an essential element of the non-movant's claim. *Id*. at 671 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party carries this burden, the opposing party cannot simply rest upon the pleadings; it must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

All of the current motions ask the court to declare the parties' rights under the respective insurance policies. "In a case of actual controversy within its jurisdiction ..., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The court finds that an actual controversy exists between the parties concerning their respective adverse obligations under the Illinois Union and National Union policies, and the controversy is of sufficient immediacy to warrant the issuance of a declaratory judgment. Such a judgment will resolve at least portions of the dispute, it will clarify the parties' legal relations, and it is an appropriate remedy under the circumstances.

3

Under Kansas law, as in most states, the following rules of construction are applied to

insurance contracts:

> " 'The language of an insurance policy, like any other contract, must, if possible, be construed in such way as to give effect to the intention of the parties. In construing a policy of insurance, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished.

> " 'Because the insurer prepares its contracts, it has a duty to make the meaning clear. If the insurer intends to restrict or limit coverage under the policy, it must use clear and unambiguous language; otherwise, the policy will be liberally construed in favor of the insured. If an insurance policy's language is clear and unambiguous, it must be taken in its plain, ordinary, and popular sense.  In such case, there is no need for judicial interpretation or the application of rules of liberal construction. The court shall not make another contract for the parties and must enforce the contract as made.

> " 'However, where the terms of an insurance policy are ambiguous or uncertain, conflicting, or susceptible of more than one construction, the construction most favorable to the insured must prevail.

> " ' "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning."

> " 'Whether a written instrument is ambiguous is a question of law to be decided by the courts. Courts should not strain to create an ambiguity where, in common sense, there is not one.  The test in determining whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean.' "

4

*See Snider v. American Family Mut. Ins. Co.*, 214 P.3d 1226 (Table) (Kan.App.,2009) [citations omitted] (*quoting American Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, 1058-59, 179 P.3d 1104 (2008)).  *See also James McHugh Const. Co. v. Zurich American Ins. Co.*, ___ N.E.2d ___, 2010 WL 1542633 (Ill.App., Apr. 13, 2010) (similar standards apply under Illinois law).

### I.  Nation Union Motion for Summary Judgment (Doc. 77).

A.  *Uncontroverted Facts*.  The court finds the following facts to be uncontroverted for purposes of the instant motion for summary judgment.  *See also additional statements of fact infra at Pp. 17-39.*

**The Underlying Pollution Liabilities**

1. On the evening of June 30, 2007, flooding from the Verdigris River reached Plaintiff's oil refinery located in Coffeyville, Kansas. Subsequently, on July 1, 2007, a refinery tank released crude oil into the floodwaters (the "oil pollution release"), causing widespread environmental contamination.

2. Plaintiff alleges that as a result of this oil pollution release and resulting environmental contamination, it has incurred more than $50,000,000 to investigate and remediate the contamination, and to defend, adjust, and resolve claims arising from the same.

**The Insurance Coverage Action**

3. On or about July 10, 2008, Plaintiff filed the instant coverage action, seeking coverage from four of its insurers for the above-referenced costs. See Ex. A. Two of the defendants, Liberty Surplus Insurance Company ("Liberty") and Illinois Union, issued pollution legal liability policies to Plaintiff. The other two insurers, National Union and Westchester Fire

Insurance Company ("Westchester), issued general liability policies to Plaintiff. See infra, Statement of Undisputed Material Facts ("SUMF") Nos. 6, 11, and 12. See also Ex. A at ¶¶ 16, 17, 19, 21, and 23.

4. On or about September 23 2008, Plaintiff fully and completely settled with Liberty and, as a result, coverage under the Liberty pollution legal liability policy is exhausted. See Plaintiff and Liberty's Joint Stipulation and Motion and Order of Dismissal with Prejudice attached as Exhibit C.

5. Plaintiff alleges that the Illinois Union policy attaches immediately excess of the Liberty policy. See Ex. A at ¶ 19. Illinois Union denies this allegation, and asserts that the National Union policy attaches first. See Illinois Union's Answer and Affirmative Defenses to the Plaintiff's Complaint, attached as Exhibit D at ¶¶ 19 and 51.

**The Illinois Union Policy**

6. Illinois Union issued Policy No. EXC G23796156 001 to Plaintiff for the September 6, 2006 to September 6, 2011 period (the "Illinois Union policy"). See Illinois Union policy attached to Exhibit B at Tab No. 2. Subject to all of its terms, exclusions, conditions and other provisions, this Illinois Union policy provides coverage for "fixed site pollution legal liability, claims made" with an aggregate limit of liability of $25,000,000. Id. at Items 2 and 5 of the Declarations.

7. Section II.A of the Illinois Union policy states that the coverage under the policy attaches after the "Underlying Policies" have paid their entire limits:

> It is expressly agreed that liability for any covered Loss shall attach to the insurer only after the insurers of the Underlying Policies shall have paid, in the applicable legal currency, the full amount of the Underlying Limit and the Insureds shall have paid

6

> the full amount of the uninsured retention, if any, applicable to the
> primary Underlying Policy.

Id. at Section II.A. Item 8 to the Illinois Union policy Declarations, titled "Schedule of

Underlying Policies," lists a single policy - - Liberty policy No. TVE-NY-101041 (the "Liberty

policy"). Id. at Item 3 of the Declarations.

8. Section II.B of the Illinois Union policy states that it will continue in force as primary

coverage once the "Underlying Policies" have been exhausted.

> B. . . . [I]n the event of the . . . exhaustion of the Underlying Limit by reason of
> the insurers of the Underlying Policies paying . . . loss otherwise covered
> hereunder, then this policy shall . . . continue in force as primary
> insurance; . . . .

Id. at Section II.B (emphasis added).

9. Section I of the Illinois Union policy states that it provides insurance coverage

"in accordance with the terms, definitions, conditions, exclusions and limitations of the

Followed Policy, except as otherwise provided herein." Id. at Section I. As with the

Schedule of Underlying Policies, the Declarations page of the Illinois Union policy

designates only the Liberty policy as the "Followed Policy." Id. at Item 3 of the

Declarations.

10. Section IV of the Illinois Union policy, titled "UNDERLYING

INSURANCE," reiterates that it follows form to the Liberty policy.

> A. This policy is subject to . . . the same terms, definitions, conditions, exclusions
> and limitations (except as regards the premium, the limits of liability, the
> policy period and except as otherwise provided herein) as are contained in
> or as may be added to the Followed Policy . . . .

Id. at Section IV.A (emphasis added).

7

11. The Illinois Union policy does not contain its own "other insurance" clause. The "Other Insurance" clause in the Liberty policy to which the Illinois Union policy follows form provides, in relevant part, as follows:

> If other valid and collectible insurance is available to the "insured" for "loss" or "business interruption expense" we cover under this policy, our obligations are limited as follows:
>
> Primary Insurance
>
> This insurance is primary and our obligations are not affected unless any of the other insurance is also primary. In that case, we will share with all such other insurance by the method described in Method of Sharing described below.
>
> Method of Sharing
>
> If all of the other insurance permits contribution of equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the "loss" or "business interruption expense" remains, whichever comes first.
>
> If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limits or insurance to the total applicable limits of insurance of all insurers.

Id. at Section I. See also Liberty policy attached to Exhibit B at Tab No. 3, Section V.13 (page 10 of the Insuring Agreement).

**The National Union Policy**

12. National Union issued Commercial Umbrella Liability policy No. 9835018 to Plaintiff for the July 1, 2007 to July 1, 2008 policy period. See National Union policy attached to Exhibit B at Tab No. 4. Subject to all of its terms, exclusions, conditions, and other provisions, the National Union policy provides general liability coverage with per occurrence and aggregate

limits of liability of $25,000,000. Id. at Items 3 of the Declarations.

13. The Insuring Agreement to the National Union policy states that the policy attaches above the "Retained Limit:"

> We will pay on behalf the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages . . .

Id. at Section I.A (emphasis added). "Retained Limit" is defined in the National Union policy to include "the total applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance to the Insured." Id. at Section VII.Z.

14. The Insuring Agreement to the National Union policy further states that "[t]he amount we will pay for damages is limited as described in Section IV. Limits of Insurance." Id. at Section IA. Section IV.F limits National Union's payment obligations, in relevant part, as follows:

> This policy applies only in excess of the total applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance whether or not such limits are collectible. …

Id. at Section IV.F (emphasis in original).

15. Similarly limiting National Union's payment obligation is Section IV.M, which provides in relevant part as follows:

> M. We will not make any payment under this policy unless and until:
> 1. the total applicable limits of Scheduled Underlying Insurance have been exhausted by the payment of Loss to which this policy applies and any applicable Other Insurance have been exhausted by the payment of Loss; . .

Id. at Section IV.M, as modified by Endorsement No. 1 (emphasis in original). The National Union policy defines "Loss" to mean "those sums actually paid as judgments or settlements." Id.

at Section VII.P.

16. The National Union policy defines "Scheduled Underlying Insurance" to mean, in relevant part, "the policy or policies of insurance and limits of insurance shown in the Schedule of Underlying Insurance forming a part of this policy . . . ." Id. at Section VII. AA. The Schedule of Underlying Insurance in the National Union policy states that: (a) American Home Assurance Company ("American Home") provides general liability coverage with limits of liability of $1 million per occurrence and $2 million in the aggregate; and (b) Lexington Insurance Company ("Lexington") provides excess liability coverage with limits of liability of $4 million per occurrence and $4 million in the aggregate. Id. at Schedule of Underlying Insurance. American Home and Lexington are not named as defendants in Plaintiff's complaint, and no party has asserted that these policies provide coverage for the pollution liabilities at issue.

17. The National Union policy defines "Other Insurance" as follows:

> T. Other Insurance means a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy. However, Other Insurance does not include Scheduled Underlying Insurance, the Self-Insured Retention or any policy of insurance specifically purchased to be excess of this policy affording coverage that this policy also affords [as amended by Endorsement No. 1].

Id. at Section VII.T and Endorsement No. 1.

18. The Conditions section to the National Union policy further states as follows with respect to the impact of "Other Insurance" upon National Union's payment obligations:

> L. Other Insurance
>
> If other valid and collectible insurance applies to damages that are also covered by this policy, this policy will apply excess to the Other Insurance. However, this provision will not apply if the Other Insurance is specifically written to be excess of this policy.

Id. at Section VI.L.

19. National Union's payment obligations are further limited by the "Time Element Pollution Self-Insured Retention Endorsement" ("Pollution Endorsement") to the policy. To the extent a loss is covered under this Pollution Endorsement, the self-insured retention is increased to $5,000,000 per occurrence:

> For the purpose of this endorsement only, the SELF-INSURED RETENTION in ITEM 5. of the DECLARATIONS, is amended to include the following additional provision:
>
>> $5,000,000 Each Occurrence (As respects all damages arising out of any discharge, dispersal, seepage, migration, release or escape of Pollutants covered under this endorsement). This Self-Insured Retention will not be reduced by Defense Expenses…..

Id. at Endorsement No. 28. The Pollution Endorsement further states that "[t]he above Self-Insured Retention applies whether or not there is any available Scheduled Underlying Insurance or Other Insurance." Id. (emphasis added).

20. The Pollution Endorsement further provides that payments received for a loss from applicable Scheduled Underlying Insurance or Other Insurance can be applied against the Self-Insured Retention as long as: (1) they are not Defense Expenses; and (2) the policies were specifically purchased to be underlying to the National Union policy:

> If there is Scheduled Underlying Insurance or Other Insurance applicable to a Loss, amounts received through such Scheduled Underlying Insurance or Other Insurance for payment of the Loss may be applied to reduce or exhaust the above Self-Insured Retention if such policies were purchased by the Named Insured to specifically apply as underlying insurance to this policy. However, in no event will amounts received through such Scheduled Underlying Insurance or Other Insurance for the payment of Defense Expenses reduce the above Self-Insured Retention.

Id. (emphasis added).

B. *National Union arguments*.  National Union moves for partial summary judgment.  It argues that to the extent the National Union and Illinois Union policies both provide coverage, plaintiff must first exhaust the Illinois Union policy before coverage will attach under the National Union policy.  It maintains the Illinois Union policy is primary and the National Union policy is secondary, and it seeks a declaration to that effect.

Its argument is based on the language of both policies.  It notes the Illinois Union policy provides that liability attaches "after the insurers of the Underlying Policies shall have paid" their underlying limit, and a single policy was listed under the "Schedule of Underlying Policies" – the Liberty policy.  The Liberty policy limit has now been paid.  Section II.B provides that the Illinois Union policy would "continue in force as primary insurance" in the event of exhaustion of the limit of "the Underlying Policies."  Section IV reiterated that the Illinois Union policy follows the Liberty policy.  The Illinois Union policy does not contain its own "Other Insurance" clause, and the "Other Insurance" clause of the followed Liberty policy provides in part that if other valid and collectible insurance is available for loss, then "this insurance is primary and our obligations are not affected unless any of the other insurance is also primary," in which case all such insurance is shared under a prescribed method.

The National Union policy, meanwhile, provides that National Union will not make any payment before the limits of "Scheduled Underlying Insurance... and any applicable Other Insurance" have been exhausted.  "Other Insurance" means "a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy."  A condition in the National Union policy dealing with "Other Insurance" provides that if other insurance applies to damages also covered by this policy, then "this policy will apply excess to

12

the Other Insurance," unless the other insurance was specifically written to be excess of this policy.  National argues the Illinois Union policy qualifies as "Other Insurance," because it is valid and collectible, and says it was not written to be excess of the National Union policy. *Citing inter alia American Cas. Co. for Reading, Pa. v. Health Care Indemnity, Inc.*, 520 F.3d 1131 (10th Cir. 2008).

National Union argues that "other insurance" clauses of this type are enforceable under Kansas law.  Where such clauses can be reconciled, courts apply them as reconciled.  National Union points out that its own clause is an "excess other insurance" clause – which says the policy is excess if there is other insurance – while the Illinois Union policy follows the Liberty "pro rata other insurance" clause – which provides that where other collectible insurance exists, the policy remains primary.  National Union argues the clauses "compliment each other and point to but one result – the parties intended the Illinois Union policy to be primary and the National Union policy to be excess."  Doc. 78 at 13.  National Union thus asks the court to declare that to the extent plaintiff's pollution liabilities are covered under both policies, plaintiff must first exhaust coverage under the Illinois Union policy before coverage will attach under the National Union policy.

C.  *Illinois Union's Response*.  Illinois Union takes issue with these arguments.  It first rejects any suggestion that the National policy is excess merely by virtue of the fact it is called an umbrella policy.  It says the nature of the policy, not its name, determines whether it is excess.  Doc. 121 at 28.  *See also* Doc. 84 at 33.  Illinois Union argues its own policy is excess because it is only collectible after a predetermined amount of primary coverage has been exhausted.  Doc. 121 at 29.  By contrast, it says, the National Union policy is only sometimes excess.  It says the

13

National Union policy is primary in these circumstances because it provides first-dollar coverage for unexpected and unintended pollution "over only a long-since exhausted self-insured retention." *Id.* And because of "horizontal exhaustion" – a principle allegedly requiring all applicable primary policies to be exhausted before the next layer of coverage may be reached, and which Illinois Union contends is the law of Illinois and Kansas – it argues National Union's policy must be exhausted before plaintiff can reach Illinois Union's policy.

Illinois Union further contends National Union's "Other Insurance" clause does not apply here. The provision says in part that "if other valid and collectible insurance applies to damages that are also covered by this [National Union] policy, this policy will apply excess of the Other Insurance," unless the other insurance is "specifically written to be excess of this policy." Illinois Union says its policy is not "collectible" because it is excess over the Liberty policy and plaintiff has failed to prove that it has more than $15 million of "non-clean-up costs" covered by the Liberty policy. Doc. 121 at 30. It further contends the Illinois Union policy was specifically written to be excess of the National Union policy, because even though it does not mention that policy by name, it states that it is not triggered until all lower levels of coverage apply, and the National Union policy is a lower level primary policy. Illinois Union thus contends the court should deny the summary judgment motion of defendant National Union.[2]

D. ***Discussion***. Although the court finds Illinois Union's arguments to be creative, they are ultimately unavailing. The Illinois Union policy is plainly triggered by exhaustion of the

_____

[2] Illinois Union questions the propriety of National Union filing a motion for summary judgment against Illinois Union, since both of these parties are defendants and there are no cross-claims. Doc. 121 at 1. Nevertheless, Illinois Union has responded to the motion, recognizing that plaintiff has raised substantially the same issue in its motion. Under these circumstances, the court concludes it is appropriate to address the issue.

Liberty policy and plaintiff's exhaustion of the $1 million Self Insured Retention applicable to the Liberty policy.  The Illinois Union excess policy generally follows form to the Liberty policy, and it stands to reason it would attach after exhaustion of the underlying policy.  The language of the Illinois policy bears that out.  It provides in part that "in the event of ... exhaustion of the Underlying Limit by reason of the Insurers of the Underlying Policies paying ... Loss otherwise covered hereunder, then this policy shall ... in the event of exhaustion, continue in force as primary insurance;..."  Doc. 84-6 at 3.  Additionally, the Illinois Union policy contains no "other insurance" clause; it incorporates the Liberty provision pursuant to which, once triggered, it remains primary even if other insurance is available.

By contrast, the National Union policy states it is excess of the "Retained Limit" and that no payment will be made until any applicable other insurance has been exhausted by the payment of loss.  The "Retained Limit," according to one of two alternative definitions, includes the total limits of any applicable "Other Insurance," which is defined as a valid and collectible policy of insurance providing coverage for damages covered in whole or part by the National Union policy. The Liberty policy (until its exhaustion) and the Illinois Union policy both qualify as "Other Insurance" under this definition.  The court rejects Illinois Union's contention that it is not "collectible."  Contrary to its assertion, plaintiff has shown that the Liberty policy has been exhausted.  Reading all of the various provisions together, they all point to a finding that the National Union policy is excess to the Illinois Union policy *as to any damages covered by both policies*.[3]  This is verified by the National Union "other insurance" clause, which provides that if

---

[3] For reasons discussed *infra*, however, the National Union policy is not excess of the Illinois Union policy insofar as costs covered by National Union but excluded by Illinois Union are concerned.

other valid and collectible insurance applies to damages also covered by this [National] policy, "this policy will apply excess of the Other Insurance." *Cf. Western Cas. & Surety Co. v. Trinity Universal Ins. Co. of Kansas, Inc.*, 13 Kan.App.2d 133, 764 P.2d 1256, 1263 (1988) (policy containing pro rata clause is other collectible primary insurance which triggers the excess clause in the second policy).

The court also rejects Illinois Union's claim that its policy was "specifically written to be excess of" the National Union policy therefore does not qualify as "other insurance."  Nothing in the Illinois Union policy remotely suggests it was specifically written to be excess of the National Union policy or of any other policy providing coverage for damages also covered by Illinois Union.  The Illinois Union policy provides that upon exhaustion of the Liberty policy, the Illinois Union policy will continue in force as primary insurance.  The "other insurance" clause of the followed Liberty policy likewise indicates the Illinois Union policy remains primary even if other insurance is available.  The declarations page of the Illinois Union policy identified only the Liberty policy in the Schedule of Underlying Policies.  The various policy provisions cannot reasonably be read as making the Illinois Union policy excess of the National Union policy.  With respect to damages covered by both policies, both policies clearly indicate an intent for the National Union policy to be excess and the Illinois Union policy to be primary after exhaustion of the Liberty Surplus coverage.  *Cf. American Cas. Co. of Reading, Pa. v. Health Care Indem., Inc.*, 520 F.3d 1131, 1136 (10th Cir. 2008).

Illinois Union's "horizontal exhaustion" argument is also untenable.  It is based on a premise that the National Union overlapping coverage is primary, but that premise is not borne out by the policy language.  As to damages covered by both policies, the National Union policy

16

is clearly excess of the Illinois Union policy.  Nor is this relative arrangement altered in any way by Illinois Union's argument that it does not qualify as "collectible" insurance because the Liberty policy has not truly been exhausted.  It contends the Liberty Surplus policy has not been exhausted "because Coffeyville has failed to fulfill its burden of proving it has more than $15,000,000.00 of non-clean-up costs covered by the Liberty Surplus policy."  Doc. 121 at 30. To begin with, Illinois Union points to no evidence of bad faith in connection with the Liberty settlement for policy limits, and it must be presumed in these circumstances that the Liberty policy has in fact been exhausted.  And plaintiff's affidavits are sufficient, absent contrary evidence, to show that the Liberty policy coverage has in fact been exhausted.  Even if the court were to find an issue of fact concerning exhaustion, that would not change the relative order of coverage between the National and Illinois Union policies.  It would only mean the exhaustion issue must be resolved before it could be determined whether Illinois Union's coverage was triggered.  *Cf. Zeig v. Massachusetts Bonding & Ins. Co.*, 23 F.2d 665, 666 (2nd Cir. 1928) (the plaintiff should have been allowed to prove the amount of his loss, and, if that loss was greater than the amount of the expressed limits of the primary insurance, he was entitled to recover the excess to the extent of the policy in suit).  In any event, to the extent plaintiff's pollution liabilities are covered under both policies, National is correct that plaintiff must first exhaust coverage under the Illinois Union policy before coverage will attach under the National Union policy.  *See* Doc. 159 at 6.  National Union's motion for partial summary judgment requesting such a declaration is therefore granted to the extent set forth above.

17

## II.  **Plaintiff's Motion for Partial Summary Judgment (Doc. 81)**.

Plaintiff Coffeyville Resources "requests partial summary judgment identifying and declaring the insurers' coverage responsibilities for oil contamination losses.  Adjudication of the insurers' coverage responsibilities," it contends, "will greatly simplify the factual determination of the remaining damage issues."  Doc. 82 at 3.

In sum, plaintiff contends that both the Illinois Union and National Union policies cover all losses or expenses of Coffeyville Resources associated with claims resolution, damages, or expenses created by the oil-contaminated real or personal property; that National Union's policy coverage will "drop down" to reimburse any oil remediation losses or liability otherwise excluded by Illinois Union's policy; that both of these policies provide coverage for plaintiff's remediation obligations, real and personal property damage, additional living expense and business interruption payments, claim resolution and defense costs; and that in each of these areas of dual coverage, Illinois Union's policy is primary, such that National Union would continue coverage upon the exhaustion of Illinois Union's $25 million policy limits.  Doc. 82 at 45.

A.  _Uncontroverted Facts_.  After reviewing the parties' recitations, the court finds the following facts to be uncontroverted for purposes of plaintiff's motion for partial summary judgment.  In keeping with the standards governing summary judgment, assertions of fact not supported by appropriate citations to the record or not otherwise appearing in the record are not included.

1.  Coffeyville Resources operates an oil refinery (the "Refinery") in Coffeyville, Kansas, adjacent to the Verdigris River.

2.  On the night of June 30, 2007, the Verdigris River experienced record flooding.  It crested at a height of more than 10 feet above flood stage, which was four feet above the Refinery's levies.

3.  During an emergency shut down of the Refinery, approximately 80,000 gallons (over 1900 barrels) of crude oil, 5,000 gallons of diesel oil, and 4,000 gallons of crude oil fractions were released into the flood waters of the Verdigris River.  Doc. 153-9 at Depo. p. 47; 107-09.

4.  The crude oil release was due primarily to an overflow of Tank 8010, an 80,000 barrel storage tank.  During the shutdown, refinery employees failed to close an inlet valve to the tank, which allowed crude oil to continue to flow into the tank until it overflowed.  As part of the emergency shutdown, refinery employees had been moving hydrocarbons into various tanks, including Tank 8010, in an effort to keep the tanks from floating off their foundations should the flood waters enter the area.  Doc. 153-3, at p. 46.   Later, after a determination was made to close the inlet valve, the person responsible for it could not do so because the flood water was too high.  *Id*. at 22.

Tank 8010 was supplied by a 16-inch pipeline from the East Tank Farm, which was located approximately three miles from the refinery.  The pipeline operated by gravity-flow but could also be pumped, depending on the level of crude in the tank.  At the time of the release, crude oil was being gravity-fed to Tank 8010, at the approximate rate of 1500-2500 barrels per hour.  Doc. 153-9 at 109.

In addition to the inlet valve located at ground level at Tank 8010 itself, there was also a valve at the East Tank Farm that could shut off the flow of crude to Tank 8010.  The valve at the East Tank Farm was normally left open.  Doc. 153-3 at p. 21.

19

The following is a summary of the evidence of events leading up to the release.  Keith Osborn, general manager of the refinery, conducted a meeting with about 20 employees on the evening of June 30, 2007, at 6:30 pm.  Doc. 133-2 at p. 26.  Osborn called the meeting because it was predicted that flood waters would come close to entering the plant, and because he wanted to have an update on the refinery's activities.  *Id*.  At 7:50 p.m. on June 30, Osborn made the decision to shut down the plant.  The shutdown procedure would normally require at least a day. *Id*.  at 29.  Part of that process would be that if a tank such as 8010 was filling, the OTS (Oil Transfer System) operator at the refinery would close the inlet valve at the tank once the tank reached its normal full operating height.  *Id*. at 29-30.  The intent of the OTS operators was to raise the level in the tank and then close the valve.  *Id*. at 60.

Flood waters started to enter the refinery at around 11:15 p.m. on the night of June 30, 2007.  Doc. 133-2 at p. 26.

Osborn conducted a meeting at 6:00 a.m. on July 1, 2007, with a group of 40 or so employees.  During that meeting, the individual who was supposed to close the inlet valve to Tank 8010 called in to report that he could not close the valve because of flood waters in the refinery.  *Id*. at 25, 64-65.  Osborn asked that the information be passed on to the Bartlesville pipeline group, which was in charge of the East Tank Farm.[4]  *Id*.  Bartlesville is located about 45

---

[4] National Union contends that a time line compiled by refinery employee Jerry Peckham on July 1 shows that "refinery employees were already addressing problems with tank 8010 no later than 0045 (12:45 a.m.) on July 1, 2007 almost six hours *before*" the 6 a.m. meeting on July 1.  The entry referred to states that at 0045, employees were "moving dsl [diesel] water pumps to high ground, trying to pull motors T14A3 and T8010."  Doc. 133-4.  The import of this entry is unclear, although it indicates there was flooding around Tank 8010 and employees were making efforts to pump water out of the area.  As plaintiff points out, nothing in the message suggests that Tank 8010 was leaking crude oil at that time.

miles from the refinery.

When asked at his deposition, Osborn conceded that if the inlet valve at the tank were left open and the valve at the East Tank Farm was open, Tank 8010 would continue to fill by gravity and would eventually overflow. *Id*. at 41. Osborn knew that the flow of crude to Tank 8010 could be shut off by closing the valve at the East Tank Farm, and that the East Tank Farm itself was not flooded. *Id*. at 36, 40, 68.

The bridge and highway from Coffeyville and the refinery to the East Tank Farm was flooded and was inaccessible by road by the time of the 6:00 a.m. July 1 meeting. Doc. 133-2 at Pp. 36, 68.

The Bartlesville pipeline manager, Bill Edens, inquired sometime in the morning on July 1 about a helicopter flyover. Osborn was asked if he wanted to come along. Doc. 133-2 at p. 39. The Bartlesville pipeline group requested that their people go over and close the valve at the East Tank Farm. Doc. 133-2 at p. 38. It took several hours, however, to make arrangements for a helicopter. Osborn rode on a flight with two people from the Bartlesville group. During that flight, pipeline employees were flown to the East Tank Farm to manually close the supply valve to Tank 8010. *Id*. at 18. Coffeyville Resources first learned that Tank 8010 was releasing oil when Keith Osborn flew over the tank on the helicopter flight at around 11:15 a.m. on July 1, 2007. He could see oil coming down the side of the tank and an obvious trail of oil leaving the tank. Doc. 122-2 at Pp. 73-74. The time at which the overflow began is unknown. Plaintiff estimates that the release from Tank 8010 began at perhaps 10:15 or 10:30 a.m. on July 1, 2007, and continued until about 11:15 or 11:30 a.m., although the release could have begun earlier. Doc. 153-9 at p. 108.

Plaintiff had the ability to measure tank levels both electronically and manually, and had access to information regarding crude oil flow rates.   The tank levels at the East Tank Farm could ordinarily be monitored by computer from the offices of Coffeyville Resources Crude Transportation located in Bartlesville, Oklahoma.  Doc. 188-1 at p. 17.  That office could also see whether the transfer pump was running or not running, and the pump could be turned off remotely from the office.  *Id*. at 17-18.  The computer was programmed to give a visual "high level" alarm.  *Id*. at 18.  Bill Eden, the manager of that office, could also monitor the tank levels and turn off the pumps remotely by logging into his personal computer at home.  *Id*. at 21.  The only thing the computer system could remotely monitor at the Refinery was the fluid level in Tank 8010.  The system could not remotely turn off the inlet valve at Tank 8010, although it could remotely close the supply valve at the East Tank Farm provided electrical power was available.  *Id*. at 27-28, 63.  If the pumps were shut off, there would still be gravity flow into Tank 8010 from the East Tank Farm unless either the supply valve at the East Tank Farm or the inlet valve at Tank 8010 were closed.  *Id*. at 28.

Bill Eden testified that he received a phone call at about 8:00 p.m. on June 30th, informing him the refinery was starting shutdown procedures.  Doc. 188-1 at 42.  At about 10:00 p.m., he received a call saying things at the refinery were deteriorating and the shutdown was being expedited.  *Id*. at 43.  Eden communicated with Jim Berry by email, asking if there were anything Eden could do to help.  Eden inquired if Berry wanted to raise the level of Tank 8010, which was then at about 28 feet, to reduce the danger of the tank floating off its foundation.  *Id*. at 44.  Berry responded that he would be more comfortable with the level being closer to 32 feet.  Eden testified that at about 12:25 a.m. on July 1, the pumps to Tank 8010 were shut down

because the oil was approaching the 32 foot level requested by Berry. *Id*. at 46. Eden did not shut down the supply valve to Tank 8010 because the normal practice at that time was to leave that valve open and to control the inflow into Tank 8010 by opening or closing the valve at the refinery. *Id*. at 61-62. Eden tried to phone Berry but was unsuccessful. *Id*. at 47. At about 1:00 a.m., Eden talked to Pat Quinn about the flow of crude coming from Cushing, Oklahoma, and whether to shut down the supply line coming into the East Tank Farm. *Id*. at 44-46. Eden testified that the computer system was monitored pretty constantly up until the pumps were shut off at 12:30 a.m., but it was monitored at unknown times thereafter. *Id*. at 49-51. He said the personnel at the Bartlesville control center should have been able to tell whether crude was flowing into Tank 8010 up to the point where the refinery lost power or communication was cut with the Tank 8010 gauge. Eden said he was not aware of any high level alarm going off for Tank 8010.

At about 7:00 a.m. on July 1, Eden received a call from Steve Lafferty of the refinery informing him that the shutting of the valve at Tank 8010 "may have been missed" and asking if Eden could remotely close something at the East Tank Farm. Doc. 188-1 at 49. Eden said he could not because the tank farm had lost electrical power sometime after 4:30 a.m. *Id*. at 49. The two discussed whether or not boats could get across the river to the East Tank Farm, but Lafferty concluded it was too dangerous. *Id*. at 53. Eden looked at some maps to see if he might be able to get to the East Tank Farm, but he could not determine a way because of widespread flooding. *Id*. Eden suggested they try to get a helicopter. After three or four attempts with other aviation companies, Eden spoke with KNB Aviation in Tulsa and made arrangements for a helicopter flyover. *Id*. at 53-56. Eden called Keith Osborn's office and provided the details,

including the plan for the helicopter to land at the football stadium in Coffeyville at around 10:30 a.m. *Id*. at 58. It was closer to 11:00 a.m. when the helicopter arrived. *Id*. Eden dispatched two employees, Gary Alspach and David Willman, to go on the helicopter flight and to shut down the valve to Tank 8010 at the East Tank Farm. *Id*. at 57.

For purposes of the instant motion, and construing the facts in the light most favorable to the non-movants, a jury could find that plaintiff negligently failed to monitor and limit the level of crude oil in Tank 8010. While it may have been a reasonable and prudent decision initially to increase the level of crude in the tank to keep it from floating off its foundation, the company clearly failed to exercise reasonable diligence thereafter to see that the tank was not over-filled. The evidence suggests this could have been accomplished rather easily, either by having someone close the inlet valve at Tank 8010 in the late night hours of June 30 or early morning hours of July 1. Even if that valve was inaccessible due to flood waters by the time the tank reached the desired level (around 12:30 a.m.), the company apparently had the ability to monitor the tank remotely via the Coffeyville Resources Crude Transportation office in Bartlesville, and to remotely close the East Tank Farm inlet valve from that office. Through an obvious lack of communication and monitoring, however, the company unnecessarily waited until 6:00 or 7:00 a.m. the morning of July 1 to follow up on the issue, by which time the absence of power meant the valve at the East Tank Farm could no longer be remotely closed and flood waters prevented access to the East Tank Farm to manually close it. Under the evidence cited, the spill from Tank 8010 would have been prevented had plaintiff's employees exercised reasonable care to communicate with each other and to monitor and limit the flow of crude into Tank 8010.

5. The diesel oil that was released came from Tank 8005 after that tank moved off its

foundation in the flood waters.  Doc. 153-3 at 57.  Additionally, the flooding of the refinery's sewer system caused the release of an estimated 100 barrels of crude oil fractions.  Doc. 153-9 at Pp. 47-48.

6.  The flood waters transported Coffeyville Resources' crude oil into the City of Coffeyville and onto business properties, homes, parks, public structures and real estate located in and around Coffeyville.  A small portion of the crude oil was transported downstream into Oklahoma, resulting in claims of livestock and agricultural damage.

7.  On July 5, 2007, Danny Dunham filed a putative class action in Case No. 07-1186-JTM in the United States District Court for the District of Kansas, alleging damages through oil contamination on behalf of himself and the "class of plaintiffs similarly situated."  Doc. 82-3, ¶2.

8.  On July 6, 2007, a class action lawsuit was filed by Western Plains Alliance, LLC, in Case No. 07 CV 99I, in the District Court of Montgomery County, Kansas.  Doc. 82-4.  The complaint asserted a class action on behalf of all persons who owned property and all businesses within the area contaminated by the oil release.  *Id*. ¶9.

9.  On July 10, 2007, Coffeyville Resources executed an Administrative Order on Consent ("AOC") with the Environmental Protection Agency to govern plaintiff's contamination removal and recovery responsibilities.  Doc. 82-5.

10.  On July 16, 2007, Coffeyville Resources posted formal notices of claim to each of the defendant insurers by certified mail.  Doc. 82-2.

11.  Thereafter, Coffeyville Resources commenced a claim resolution program to address and resolve potential claims from the release.  The program resulted in:

a. Purchase and demolition of over 320 residences;

25

b.  Payment of over 2,181 claims related to personalty and realty;

c.  Payment of over 429 claims related to additional living expenses;

d.  Resolution of more than 70 claims of commercial establishments.

Plaintiff contends all of these claims were related to oil contamination.  Doc. 153-5 at Pp. 59, 88-89, 121.

12.  As of October 19, 2008, Coffeyville Resources had spent a total of $50,580,341.96 in response to the July 1, 2008 oil spill.  Doc. 122-12, ¶2.  These expenditures included:

a.  General removal and recovery of oil as required by the EPA Administrative Order on Consent;

b.  Claims settlement of realty damage, personalty damage, bodily injury, business interruption, and additional living expenses associated with the oil release; and

c.  Administrative costs and defense costs associated with the litigation and claim resolution procedures.

Plaintiff has submitted an "Environmental Costs Database Summary" (Doc. 122-12) containing a summary of what plaintiff allegedly spent in connection with the spill.  According to the accompanying affidavit of Sam A. McCormick, Environmental Projects Manager for the plaintiff's parent company, plaintiff compiled the summary to reflect and categorize its various expenses in connection with the spill.  McCormick determined which expenses were placed in which category.  Among the categories and expenses he identified were the following:

•  $3,940,287.86  – Clean-up costs within the meaning of the Liberty and Illinois Union policies ($3,889,559.11 of which was paid by Liberty)

•  $5,468,837 – paid to Pilot Catastrophe, for claim center administration and associated

26

claim adjustment activities to resolve third party claims

- $471,568.28 – to reimburse area residents for alternate living expenses

- $120,309.03 – for automobile damage

- $1,630,519.95 – for damage to personal property (reflects adjustment of 0% to 50% percent of the total damage based on individual assessment of the height of the water and intensity of oil damage)

- $975.00 – bodily injury claims

- $8,033,700.70 – purchase of oil-impacted residential properties

- $1,158,247.52 – purchase of oil-impacted commercial properties

- $856,458.77 – for business interruption and damage to businesses' personal property

- $126,543.93 – for settlement of oil-related agricultural claims

- $7,760.66 – for veterinary fees associated with alleged damage to pets

- $6,920,695.74 – for demolition and removal of purchased structures

- $15,917,115.67 – for oil removal or disposal of impacted third-party property

- $1,416,637.10 – for laboratory sampling and analysis in connection with the purchase program and oil removal related to settlement obligations

- $1,382,100.09 – for litigation support related to negotiation of the AOC, reporting obligations, class action lawsuits, and other lawsuits against plaintiff.

According to McCormick, as of October 19, 2008, Coffeyville Resources had spent $50,580,341.96 to respond to the oil spill and to resolve third-party claims. Plaintiff has incurred $24,580,341.96 in expenses in excess of the applicable $1 million retention and the $25 million limit of the Liberty policy.

27

13.  At the time of the flood and oil release, Coffeyville Resources possessed Liberty's
Pollution Legal Liability Policy No. TVE-101041-016, which provided aggregate policy limits
of $25,000,000 for:

> ... those sums the "insured" becomes legally obligated to pay for
> "loss" arising from "claims" for "bodily injury" or "property
> damage" caused by "pollution conditions" at or emanating from a
> "covered location."

(There is no genuine dispute as to the contents of the various insurance policies at issue
in this case, and they are hereby incorporated by reference.  Various portions of the policies are
discussed *infra* in addressing the parties' summary judgment arguments.)

14.  Coffeyville Resources also possessed an Illinois Union Excess Liability Insurance
Policy No. EXC G23796156001 which provided an additional $25,000,000 layer of coverage
following the Liberty policy terms and conditions (with some variations), through the following
insurance clause:

> ...[Illinois Union] agrees to provide insurance coverage to the
> Insureds in accordance with the terms, definitions, conditions,
> exclusions and limitations of the Followed Policy [i.e., the Liberty
> policy] except as otherwise provided herein.

The Illinois Union Excess Policy referred to the Liberty Policy as either the "Followed Policy"
or the "Underlying Policy."

In a limiting endorsement, the Illinois Union policy specifically excluded "any 'cleanup
costs' and any associated 'defense expense(s)'" and "any 'business interruption expense' and
any associated 'defense expense(s)'".  The quoted terms were based on definitions in the Liberty
policy.

15.  At the time of the oil release, Coffeyville Resources was also insured under National

Union's Policy No. 9835018.  This Commercial Umbrella Liability Policy ("CGL Umbrella") provided an additional $25,000,000 of general liability coverage, with certain exclusions including one for property damage "arising out of any discharge, dispersal, seepage, migration, release or escape of Pollutants...."  An exception, however, allowed coverage for pollution releases if certain conditions were met, one of which was if the discharge or release was "was abrupt and neither expected nor intended by the Insured."

16.  National Union's CGL Umbrella policy referred to above (No. 9835018) was in effect for July 1, 2007, to July 1, 2008.  Although the flood began on June 30, 2007, the oil release from the refinery commenced on July 1, 2007, and Policy No. 9835018 was thus in effect.

17.  National Union's prior CGL Umbrella policy, No. 4485527, was in effect from July 1, 2006, to July 1, 2007.  The prior coverage and the succeeding coverage are identical for all purposes related to Coffeyville Resource's claims.  The pollution endorsements provided continuous and identical pollution coverage under either policy.

18.  Westchester Fire Insurance Company issued Excess Insurance Policy No. G2203523A002 effective from July 1, 2007, to July 1, 2008.  (This was also a renewal policy).

19.  In October 2007, Liberty tendered a $10,000,000 insurance payment while denying any remaining insurance policy coverage obligation, contending the Liberty policy's sub-limit of $10,000,000 for "clean up costs" contractually precluded further indemnification.

20.  Because Liberty had not tendered or paid its policy limits, Illinois Union continued to deny coverage under Section 11(A) of Illinois Union's policy, which provided:

> It is expressly agreed that liability for any covered Loss shall
> attach to the Insurer only after the insurers of the Underlying

29

> Policies shall have paid ... the full amount of the Underlying Limit
> and the Insureds shall have paid the full amount of the uninsured
> retention, if any, applicable to the primary Underlying Policy.

21.  Similarly, National Union denied coverage pursuant to its "Other Insurance"

provision, which stated:

> If other valid and collectable insurance applies to the damages that
> are also covered by this policy, this policy will apply excess of the
> Other Insurance.  However, this provision will not apply if the
> Other Insurance is specifically written to be excess of this policy.

22.  On May 20, 2008, Coffeyville Resources received a series of Oil Pollution Act

Notices of Claim related to alleged oil contamination damages of seven commercial

establishments within Coffeyville, and approximately fifteen agricultural claims related to farms

in Oklahoma.

23.  On July 10, 2008, Coffeyville Resources filed its complaint against these insurers.

24.  On August 19, 2008, the Oil Pollution Act claimants filed their complaint in Case

No.  08-1255-MLB-KMH in the United States District Court for the District of Kansas.

25.  On September 18, 2008, Liberty tendered and paid plaintiff an additional

$15,000,000 under its Pollution Liability Policy, thereby reaching the $25,000,000 limit on that

policy.  Coffeyville Resources filed a Motion to Dismiss and executed a settlement agreement

under which Liberty was dismissed with prejudice on September 25, 2008.

26.  Illinois Union and National Union have continued to deny coverage.

*Illinois Union's Supplemental Statement of Facts.*

1. On July 1, 2007, approximately 80,000 gallons of crude oil spilled from a refinery

owned by Coffeyville in Coffeyville, Kansas.

2. According to Coffeyville, the spill occurred when Coffeyville mistakenly allowed

crude oil to be pumped into a storage tank after it had reached capacity.

3. Due to contemporaneous widespread flooding, the oil reached a large area, particularly through the Verdigris River, and ultimately entered homes and businesses in the surrounding community.

4. The United States Environmental Protection Agency ordered Coffeyville to investigate and clean up the environmental contamination.

5. Coffeyville alleges it has spent in excess of $50,000,000 to comply with this cleanup order and to investigate and resolve various private third-party claims arising from this environmental contamination, and seeks recovery of those expenditures from the insurers in the lawsuit.

6. Illinois Union contends the following chart illustrates the insurance policies at issue:



7. Beginning at the lower left-hand corner of the chart, the first three boxes or table cells represent Pollution Legal Liability Policy No. TVE-NY-101041-016, which Liberty Surplus issued to Coffeyville for the period of September 6, 2006 to September 6, 2007 (the "Liberty Surplus policy").

8. The Liberty Surplus policy has policy limits of $25 million per "pollution condition" and in the aggregate for most coverages, with a smaller per "pollution condition" sublimit of $10 million for "Clean-up Costs Resulting from New Pollution Conditions," all in excess of a $1 million self-insured retention ("SIR").

9. Exhibit 1 to Coffeyville's complaint is a true and correct copy of the Liberty Surplus policy.

10. The cell directly above the third of the three cells just discussed, marked "ACE," corresponds to Excess Liability Insurance Policy No. EXC G23796156 001, providing "Fixed Site Pollution Legal Liability" coverage on a claims made basis, which Illinois Union issued to Coffeyville for the policy period of September 6, 2006 to September 6, 2011 (the "Illinois Union policy").

11. The Illinois Union policy has a $25 million limit for bodily injury and property damage claims arising out of pollution conditions, in excess over the Liberty Surplus policy.

12. Exhibit 6 to this motion is a true and correct copy of the Illinois Union policy.

13. In the lower right-hand corner of the chart, there are cells signifying Commercial Umbrella Liability Policy No. 9835018, issued by National Union to Coffeyville for the period of July 1, 2007 to July 1, 200819 (the "National Union policy"), and its underlying $5 million SIR.

14. The National Union policy has a $25 million limit for bodily injury and property damage claims in excess over the SIR just mentioned.

National Union denies that the foregoing chart and statements accurately illustrate the insurance policies at issue. It argues that the Illinois Union policy, not the National Union policy, now acts as a primary policy.  Because the underlying Liberty policy is exhausted, it maintains, the Illinois Union policy now "continues in force as primary insurance" under the terms of that policy.  The National Union policy is not primary, it argues, but an umbrella policy with limited pollution coverage, and this limited pollution coverage sits above the $5,000,000 Self-Insured Retention.

15. Exhibit 3 to Coffeyville's complaint is a true and correct copy of the National Union policy.

16. Coffeyville hired numerous contractors to assist in the cleanup of the area affected by the subject spill and set up a claim center to handle third-party claims.

17. The contractors cleaned up oily debris and washed structures on both public and private property, and Coffeyville's claim center identified residences and businesses with oil damage.

18. Coffeyville ultimately identified approximately 330 residences with oil related damage.

19. Most of those homes were appraised by third-party firms and purchased by Coffeyville for at least 110% of their pre-flood value.

20. Coffeyville then either cleaned or demolished the homes it purchased and those that were still owned by third parties.

33

21. In addition to purchasing homes, Coffeyville paid residents for additional living expenses, automobile damage, bodily injuries, property damage and damage to contents.

22. Coffeyville also purchased and remediated commercial properties and settled with many of the remediated property owners for any additional property damage.

23. The claim center processed claims for approximately 70 business properties with oil related damage.

24. In many cases, Coffeyville also paid for business interruption, out-of-pocket clean up expenses, and other forms of property damage.

25. Various claimants also filed lawsuits against Coffeyville for damages related to the July 2007 releases of crude oil.

26. One group of plaintiffs filed a class action entitled Danny Dunham, et al. v. Coffeyville Resources, LLC on July 4, 2007 in the United States District Court for the District of Kansas. This suit has since been dismissed.

27. Another group of plaintiffs filed a class action entitled Western Plains Alliance, LLC v. Coffeyville Resources Refining and Marketing, LLC on July 6, 2007 in the District Court of Montgomery County, Kansas. The class was never certified and Coffeyville has since reached a settlement with the plaintiffs.

28. A pro se plaintiff, Melissa Phillips, has also filed suit against Coffeyville in state court.

29. Fifteen or sixteen commercial property claimants filed a suit captioned Duane Angleton, et al. v. Coffeyville Resources Refining & Marketing, LLC on August 18, 2008 in the United States District Court for the District of Kansas.

34

Coffeyville's Coverage Claims

30. On July 16, 2007, Coffeyville provided Liberty Surplus and National Union with formal notice of the flood and oil spill.

31. The same day, Coffeyville also gave formal notice to Illinois Union.

32. On July 24, 2007, Illinois Union reserved its rights, and a true and correct copy of the reservation of rights letter is Exhibit 8 to this motion.

33. Coffeyville, thereafter, demanded Liberty Surplus's policy limits.

34. Liberty Surplus tendered its policy sub-limit of $10,000,000 for "clean-up," on November 7, 2007, and denied any further liability.

35. On November 19, 2007, Coffeyville demanded National Union's policy limits, and on December 4, 2007, National Union denied liability.

36. National Union contended that it had no obligation to respond until the entire aggregate limits of the Liberty Surplus and Illinois Union policies were exhausted.

37. Then, on September 19, 2008, Liberty Surplus tendered the additional $15,000,000 that Coffeyville claimed was due under the policy.

*National Union's Supplemental Statement of Facts.*

1. Endorsement no. 28 to National Union policy no. 9835018, titled "Time Element Pollution, Self-Insured Retention Endorsement," (hereinafter "Pollution Endorsement") replaces the pollution exclusion in the main policy form, and excludes pollution liability risks as follows: This insurance does not apply to:

> 1. Any Bodily Injury, Property Damage or Personal Injury and Advertising Injury arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of Pollutants anywhere at any time;

2. Any loss, cost or expense arising out of any request, demand, order or statutory or regulatory requirement that the Insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of Pollutants; or

3. Any loss, cost or expense arising out of any claim or Suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of Pollutants.

Exhibit no. 3, Endorsement no. 28, p.1.

2. The National Union Pollution Endorsement provides the following limited exception

to one of the three exclusionary paragraphs identified above:

However, Paragraph 1 of this exclusion will not apply to Bodily Injury or Property Damage arising out of any discharge, dispersal, seepage, migration, release or escape of Pollutants that meets all of the following conditions:

i. It was abrupt and neither expected nor intended by the Insured. This condition does not apply to a non-routine incident where such discharge, dispersal, seepage, migration, release or escape of Pollutants was a result of an attempt by the Insured to mitigate or avoid a discharge, dispersal, seepage, migration, release or escape of Pollutants that was itself abrupt and neither expected nor intended by the Insured and where substantial third party Bodily Injury or Property Damage could have occurred;

ii. It commenced on a demonstrable, specific date during the Policy Period;

iii. Its commencement became known to the Insured within (7) calendar days;

iv. Its commencement was reported in writing to us within (21) calendar days of becoming known to the Insured; and

v. Reasonable effort was expended by the Insured to terminate the discharge, dispersal, seepage, migration, release or escape of Pollutants as soon as conditions permitted.

3. The National Union Pollution Endorsement further states:

However, nothing contained in this endorsement will operate to provide any coverage with respect to:

i. Any site or location principally used by the Insured, or by others on the Insured's behalf, for the handling, storage, disposal, dumping, processing or treatment of waste material;

ii. Any fines or penalties;

iii. Any clean up loss, cost or expense arising out of any governmental request, demand, order or statutory or regulatory requirement. However, this provision iii will not apply to third

36

party cleanup loss, cost or expense otherwise covered by this endorsement that are also the subject of a governmental request, demand, order or statutory or regulatory requirement;

iv. Acid rain or acid runoff;

v. Clean-up, removal, containment, treatment, detoxification or neutralization of Pollutants situated on premises which the Insured owns, rents or occupies at the time of the actual discharge, dispersal, seepage, migration, release or escape of said Pollutants; or

vi. Any Bodily Injury, Property Damage or Personal Injury and Advertising Injury, or any loss, cost or expense arising out of any discharge, dispersal, seepage, migration, release or escape of Pollutants in knowing violation of or non compliance with governmental permits.

4. The National Union Pollution Endorsement provides that National Union has no

defense obligations with respect to suits arising from pollution release which meet the

parameters of the exception to the pollution exclusion:

For the purpose of this endorsement only, Section III. DEFENSE PROVISIONS Paragraphs A. and D. are deleted in their entirety and Paragraph A. is replaced by the following:

We will have no duty to defend any Suit against the Insured. We will, however, have the right, but not the duty, to participate in the defense of any Suit and the investigation of any claim to which this endorsement may apply. If we exercise this right, we will do so at our own expense.

5. The National Union Pollution Endorsement further incorporates the following

definition of Defense Expenses:

For the purpose of this endorsement only, Section VII. DEFINITIONS is amended to include the following additional definitions:

Defense Expenses means a payment allocated to defend a specific Suit, including but not limited to:
1. Attorneys' fees and all other investigation, loss adjustment and litigation expenses;
2. Premiums on bonds to release attachments;
3. Premiums on appeal bonds required by law to appeal any claim or Suit;
4. Court costs taxed against the Insured in any Suit;
5. Pre-judgment interest awarded against the Insured; and
6. Interest that accrues after entry of judgment.

6. The National Union Pollution Endorsement further modifies the policy Declarations to

provide for a $5,000,000 Self Insured Retention with respect to pollution liability:

For the purpose of this endorsement only, the SELF-INSURED RETENTION in ITEM 5. of the DECLARATIONS, is amended to include the following additional provision:

$5,000,000 Each Occurrence (As respects all damages arising out of any discharge, dispersal, seepage, migration, release or escape of Pollutants covered under this endorsement). This Self-Insured Retention will not be reduced by Defense Expenses.

The above Self-Insured Retention applies whether or not there is any available Scheduled Underlying Insurance or Other Insurance. If there is Scheduled Underlying Insurance or Other Insurance applicable to a Loss, amounts received through such Scheduled Underlying Insurance or Other Insurance for payment of the Loss may be applied to reduce or exhaust the above Self-Insured Retention if such policies were purchased by the Named Insured to specifically apply as underlying insurance to this policy. However, in no event will amounts received through such Scheduled Underlying Insurance or Other Insurance for the payment of Defense Expenses reduce the above Self-Insured Retention

7. The National Union policy further states that the policy attaches above the "Retained

Limit:"

We will pay on behalf the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages . . .

The policy provides that "Retained Limit" means:

1. the total applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance providing coverage to the Insured; or

2. the Self-Insured Retention applicable to each Occurrence that results in damages not covered by the Scheduled Underlying Insurance nor any applicable Other Insurance providing coverage to the Insured.

8. The Insuring Agreement to the National Union policy further states that "[t]he amount

we will pay for damages is limited as described in Section IV. Limits of Insurance." Id. at

Section I. Section IV.F limits National Union's payment obligations, in relevant part, as follows:

This policy applies only in excess of the total applicable limits of Scheduled Underlying Insurance and any Applicable Other Insurance whether or such limits are collectible. …

9.  Under "Limits of Insurance," the National Union policy, as amended by Endorsement No. 1, provides in relevant part as follows:

M. We will not make any payment under this policy unless and until:

1. the total applicable limits of Scheduled Underlying Insurance have been exhausted by the payment of Loss to which this policy applies and any applicable Other Insurance have been exhausted by the payment of Loss.

The National Union policy defines "Loss" to mean "those sums actually paid as judgments or settlements." Id. at Section VII.P.

10. The National Union policy defines "Scheduled Underlying Insurance" to mean, in relevant part, "the policy or policies of insurance and limits of insurance shown in the Schedule of Underlying Insurance forming a part of this policy . . . ." Id. at Section VII. AA. The Schedule of Underlying Insurance in the National Union policy states that: (a) American Home Assurance Company ("American Home") provides general liability coverage with limits of liability of $1 million per occurrence and $2 million in the aggregate; and (b) Lexington Insurance Company ("Lexington") provides excess liability coverage with limits of liability of $4 million per occurrence and $4 million in the aggregate. Id. at Schedule of Underlying Insurance. American Home and Lexington are not named as defendants in Plaintiff's complaint, and no party has asserted that these policies provide coverage for Plaintiff's pollution liabilities at issue.

11. The National Union policy defines "Other Insurance" as follows:

T. Other Insurance means a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy.

However, Other Insurance does not include Scheduled Underlying Insurance, the Self-Insured Retention or any policy of insurance specifically purchased to be excess of this policy affording

39

coverage that this policy also affords [as amended by Endorsement No. 3].

12. The Conditions section to the National Union policy further states as follows with respect to the impact of "Other Insurance" upon National Union's payment obligations:

> L. Other Insurance
>
> If other valid and collectible insurance applies to damages that are also covered by this policy, this policy will apply excess to the Other Insurance. However, this provision will not apply if the Other Insurance is specifically written to be excess of this policy.

[13]. Plant Manager Osborn testified that an oil pollution release from the refinery took place on July 1, 2007 from the "sewer system" at the refinery, as flood waters inundated the refinery. Id. at 39, 85-87. Refinery Environmental Manager John Ditmore acknowledged that this "oily sewer system" is used by Plaintiff to handle and process oily waste streams. See, Transcript of November 25, 2008 deposition of John Ditmore at pp. 30-38.

[14]. Pursuant to the September, 2008 Liberty settlement agreement, Liberty's $25,000,000 payment was allocated to specific alleged invoices. The Liberty settlement identified $24,279,842.48 in alleged invoices which purportedly remained unpaid. See, September, 2008 Liberty Settlement Agreement.

[15]. By July 12, 2007, governmental officials had determined that hundreds of residential properties were so badly damaged that they would need to be demolished. See, July 12, 2007 Master Work Plan (as revised August 1, 2007) at section 5.3.2 (p. 33). An October 22, 2007 City of Coffeyville Resolution further declared that "an urgent need to remove certain structures existed" and that these structures sustained flood damage which rendered them structurally unsound and in danger of imminent collapse. See, October 2, 2007 City of

40

Coffeyville Resolution.

**B.  Clean-Up Costs / Property Damage**.   Plaintiff's first issue "relates to the parties' conflicting interpretation of the terms 'clean-up costs' and 'property damage' within the Liberty policy."  Doc. 82 at 16.  Plaintiff argues that Illinois Union's coverage for property damage and its exclusion of clean up costs irreconcilably conflict, because "property damage" encompasses "physical injury to or destruction of ... tangible property," which according to plaintiff includes all harm to property from oil pollution, and the costs associated with remediation of such harm is therefore necessarily included under the property damage coverage.  Yet the Illinois Union policy excludes clean-up costs, which are defined by the Liberty policy to mean the very same costs of remediation.  At the very least,  plaintiff contends, the confusion between these provisions "creates an ambiguity which must be construed in favor of the insured," lest the exclusion eviscerate the benefits of the policy.  Doc. 82 at 19.  Because of the ambiguity, plaintiff argues, the court should determine that all costs to remediate the environment are "property damage" within the meaning of the Liberty and Illinois Union policies.  *Id*. at 20 (*citing Cessna Aircraft Co. v. Hartford Accident & Indem. Co.*, 900 F.Supp. 1489 (D. Kan. 1995)).  Plaintiff argues that *Cessna Aircraft* and other cases construing similar provisions hold that contamination of the environment constitutes property damage and that response costs imposed to remediate pollution are "damages" covered by the policy.  *Id*. at 21-22.

*Illinois Union Response*.  Illinois Union notes that its "Follow Form Limitation Endorsement" specifically provides that notwithstanding any provisions in the followed (Liberty) policy, the Illinois Union policy does not apply to any "cleanup costs" and any

41

associated "defense expense[s]", or to any "business interruption expense" and any associated "defense expense[s]," as those terms are defined in the Liberty policy.  Doc. 84, Exh. 6 at 000505.  Thus, defendant argues, the only applicable coverage grant in the Liberty policy is for "Bodily Injury and Property Damage Resulting from New Pollution Conditions" in Section 1.c.2.  And even though Liberty's definition of "loss" included cleanup costs,  the Illinois Union endorsement specifically dealt with and excluded such costs.  Plaintiff's argument that the provisions are ambiguous is unavailing, defendant argues, because the terms are clear and the Illinois Union policy is a pollution liability policy that specifically addressed clean-up costs. *Citing Rhone-Poulenc Inc. v. International Ins. Co.* , 1997 WL 264299 (N. D. Ill., May 8, 1997). This is distinguishable, defendant argues, from *Cessna Aircraft Co. v. Hartford Accid. & Indem. Co.*, 900 F.Supp. 1489 (D. Kan. 1995) and other cases involving commercial general liability policies that did not define or limit the term "damages."  Illinois Union argues that all of plaintiff's clean-up costs are outside of Illinois Union's coverage.

    *Discussion*.  As an initial matter, plaintiff and Illinois Union disagree as to whether Kansas or Illinois law governs construction of the Illinois Union policy.  In a diversity case such as this, the court applies the choice-of-law rules of the forum state to determine which state's substantive law applies. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Kansas applies the rule of *lex loci contractus* (the law of the place where the contract was made governs), and in the context of insurance policies the last act for formation of the contract is generally considered to be the delivery of the policy (and perhaps the payment of a premium). *See Atlantic Mut. Companies v. Home Depot U.S.A., Inc*., 2003 WL 202607, *4 (D. Kan. 2003).

Defendant contends delivery of the policy took place in Illinois.  Assuming that to be so,[5] Illinois Union still has not identified any material differences between Illinois and Kansas law as far as this policy is concerned.  "Where there is no difference between the laws of the forum state and those of the foreign jurisdiction, there is a 'false conflict' and the court need not decide the choice of law issue."  *Brenner v. Oppenheimer & Co., Inc.*, 273 Kan. 525, 44 P.3d 364 (2002) (*citing Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808 (3rd Cir. 1994)).  And after reviewing and comparing various provisions of Kansas and Illinois law, the court finds no substantive differences between the two as pertains to this policy.

The Liberty and Illinois Union policies both provide coverage for sums the insured becomes legally obligated to pay for loss arising from claims for property damage.  "Property damage" is defined in part as "physical injury to or destruction of ... tangible property, including all resulting loss of use, and diminution in value of that property," as well as loss of use of tangible property that was not physically injured.  Under the Liberty policy, coverage for "clean-up costs" is also provided but is treated separately from property damage coverage.  According to the Liberty policy, "Property damage does not include 'clean-up costs,'" and "Cleanup costs" means costs or charges "to investigate, neutralize, remove, remediate, monitor and dispose of 'pollutants' to the extent required by 'environmental laws', or that have actually been incurred by any governmental entity duly acting under the authority of 'environmental laws', or that have

---

[5] If there were any difference, the court would apply Illinois law in construing this contract.  Illinois Union cites a letter to support its claim that this policy was issued, signed, and delivered in Illinois, making Illinois law applicable.  Doc. 84, Exh. 6, at CV-ACE 000511.  Plaintiff cites no evidence to contradict this assertion, and the court finds it to be uncontroverted for purposes of this motion.

actually been incurred by third parties."[6]   The Illinois Union policy excludes clean-up costs from its coverage, leading to the current question of how these terms are construed.

Absent further definition or limitation, a policy promising pollution liability coverage for loss arising from claims for property damage could lead a reasonable insured to believe that the full cost of remedying harm to the property of third-party claimants – including governmentally-imposed clean-up costs requiring the insured to completely remediate the property – are within the scope of coverage. *See Cessna Aircraft Co. v. Hartford Accid. & Indem. Co.*, 900 F.Supp. 1489, 1498 (D. Kan. 1995); *Central Illinois Light Co. v. Home Ins. Co.*, 213 Ill.2d 141, 821 N.E.2d 206, 226 (2004) ("We conclude that these expenditures were made in response to a claim of strict liability, asserted by the [Illinois EPA] against [plaintiff], and that they were made for a remedial purpose. As such, they constitute damages within the plain meaning of the policies."). *See also Boeing Co. v. Aetna Cas. & Surety Co.*, 113 Wash.2d 869, 784 P.2d 507 (1990) (listing cases finding cleanup costs to be compensatory damages for injury to property).  The Illinois Union policy attempts to overcome such a construction by specifically excluding "clean-up costs."  Even if clear in isolation, however, this exclusion creates some ambiguity or confusion about the scope of Illinois Union's property damage coverage.

---

[6] Unlike the first two clauses defining clean-up costs, the third clause (pertaining to third parties) makes no explicit reference to "environmental laws."  Nevertheless, the court concludes it likewise refers to costs incurred by third parties *that are required by environmental laws*.  This is so because the main clause only excludes the cost of these activities "to the extent [such costs are] required by 'environmental laws,'" and the third-party clause is dependent upon the first clause.  This construction is also consistent with the insured's reasonable expectation that the policy provides coverage for third-party property damage claims, including reimbursement of costs incurred by property owners in cleaning up their property, if such costs are an appropriate measure of property damage in a particular instance.  The court rejects Illinois Union's apparent suggestion that the third clause absolutely bars any coverage for clean-up costs associated with third party claims or incurred by third parties.  *See* Doc. 161 at 7;  296 at 2, n.1.

The common law of liability for property damage provides a framework for determining what a reasonable insured would understand "property damage" coverage to entail when the policy specifically excludes governmentally-required "clean-up costs."  As a general rule, when property can reasonably be restored to its prior condition, the damages available are typically the cost of repair or restoration of the property.  *Cf. Horsch v. Terminix Intern. Co., Ltd. Partnership*, 19 Kan.App.2d 134, 865 P.2d 1044 (1993).  *See also Clean Harbors,* 916 N.E.2d at 411.  This potentially creates confusion concerning the effect of the "clean-up cost" exclusion because "clean-up costs" and "damages for property damage" often overlap.  *Clean Harbors Environmental Services, Inc. v. Boston Basement Technologies, Inc.*, 75 Mass.App.Ct. 709, 916 N.E.2d 406, 414 (2009).  And the restoration costs for a particular property would include all costs necessary to *lawfully* restore it to its prior condition, including the cost of investigating, assessing, neutralizing, removing, and disposing of pollutants in accordance with governing laws.  Also, even when a property owner's claim seeks an injunction ordering the insured to clean up the property, as opposed to a monetary award, the insured's cost to comply with such an injunction can still reasonably be considered a sum the insured is legally obligated to pay for loss arising from claims for property damage.  *See e.g., Cessna Aircraft Co. v. Hartford Accid. & Indem. Co.*, 900 F.Supp. at 1498; *Central Illinois Light Co. v. Home Ins. Co.*, 342 Ill.App.3d 940, 795 N.E.2d 412, 424 (2003) ("'damages' connotes money one must expend to remedy an injury for which he or she is responsible, irrespective of whether that expenditure is compelled by a court of law in the form of compensatory damages or by a court of equity in the form of compliance with mandatory injunctions.").  In the circumstances described above, where clean-up costs and loss from property damage not only coincide but are essentially co-extensive, the

Illinois Union coverage for property damage must be construed to provide coverage for settlement of such claims.[7] *Cf. Black v. Coastal Oil New England, Inc.*, 45 Mass.App.Ct. 461, 699 N.E.2d 353, 355-57 (1988); *Clean Harbors,* 916 N.E.2d at 715.

In other circumstances, "clean-up costs," as defined by the Liberty policy,  may be more distinct from compensatory damages for property damage.  If the cost to remediate pollution on a particular property exceeds the value of that property, the compensatory damages available to the property owner may be limited by law to the property's pre-flood fair market value.  *See* PIK Civ. 4th 171.20.  *Cf. Ettus v. Orkin Exterminating Co., Inc.*, 233 Kan. 555, 665 P.2d 730 (1983) (ordinary measure of damages in the event of destruction of property is the fair market value at the time of destruction); *Restatement of Torts (Second)* § 929, comment b ("[t]he reasonable cost of replacing the land in its original position is ordinarily allowable as the measure of recovery. * * * If,  however, the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass, unless there is a reason personal to the owner for restoring the original condition, damages are measured only by the difference between the value of the land before and after the harm.").  Thus, where it is not feasible to restore the property, or where the cost of doing so is disproportionate to the property's value, recoverable property damages are ordinarily limited to the market value of the property before the injury.  In that situation, the Illinois Union policy would clearly provide

---

[7] In *Clean Harbors*, the policy further clarified that the exclusion for statutorily-required clean-up costs does not apply to liability for property damage that the insured would have in the absence of such a statute.  Illinois Union's policy does not contain such a clarification, leaving the scope of property damage coverage ambiguous.  The court thus construes the Illinois Union policy in favor of plaintiff on this point, effectively leading to the same construction as the *Clean Harbors* court.

property damage coverage for settlement of a claim at least up to the pre-flood fair market value of the damaged property, plus any appropriate consequential damages to the property owner.[8] But given the policy's explicit exclusion of "clean-up costs" and its definition of that term, Plaintiff's additional liability to fully remediate such property would exist solely because of plaintiff's obligations under environmental laws and would not constitute liability for claims of property damage.   In that circumstance, expenses above and beyond the compensation owed to the property owner would fairly be characterized as "clean up costs" excluded by the policy.   *Cf. Clean Harbors*, *supra*, 916 N.E.2d at 413 ("Because the legislative aim is to protect the environment rather than simply to redress lost property value for an individual property owner, costs to a responsible party may far surpass the diminution in value of the damaged property and may extend far beyond the cost of remediating a single piece of property.").

Finally, a third possibility exists.   Where a property owner has a personal reason for retaining and restoring property – as where the property is the owner's personal residence – property damages may be allowed for the full cost of restoring the property unless that cost is "unreasonable" or "wholly disproportionate" to the value of the land.   *See e.g., Ettus v. Orkin Exterminating Co., Inc.*, 233 Kan. 555, 665 P.2d 730 (1983); *LaSalle Nat. Bank v. Willis*, 378 Ill.App.3d, 880 N.E.2d 1075, 1093-94 (2007).   *See also* Am. Jur. 2d. Damages, §256 (While recovery will usually be limited to the diminution of market value if the cost of restoring the land is disproportionate, the greater cost of repair will be allowed where the owner has some personal reason for restoring the land to its original condition, and the cost of restoration is not

---

[8] Defendant argues – and the court agrees – that where plaintiff obtained real property as part of a settlement, the damages covered by the policy would have to be reduced or offset by the residual fair market value, if any, of the property obtained by plaintiff.

unreasonable in relation to the damage inflicted and the value of the land prior to the tort). Such a determination depends upon the value of a particular property and the extent of the cost to restore it. But it means a party responsible for causing damage to residential property could be liable for "restoration-cost" damages even when such costs significantly exceed the fair market value of the property. And under the terms of the Illinois Union policy, coverage would be provided for settlement of any such property damage liability claims.

Illinois Union argues there is no ambiguity in the distinction or relationship between property damage and clean-up costs, although its explanation arguably refutes the assertion:

> While Coffeyville's statement may be partially true in a literal sense when viewing the definition in isolation, it is also pointless because "clean-up costs" is a subpart of Liberty Mutual's definition of "loss," and the relevant insuring agreement only requires Liberty Surplus to pay for "'loss' arising from 'claims' for 'bodily injury' or 'property damage.'" Any clean-up costs that do not arise from claims for bodily injury or property damage, therefore, are not covered by Liberty Surplus and are irrelevant. In other words, while "clean-up costs" are independent in concept from "property damage," and may encompass some costs that do arise "from 'claims' for 'bodily injury' or 'property damage'" and some costs that do not, only the costs that do so arise may be covered and may have any pertinence to this lawsuit.

Doc. 121 at 13-14. *See also id.* at 14-15. The legion of cases dealing with similar provisions suggests the distinction is not entirely clear. *See e.g., Liability Insurance Coverage for Violations of Antipollution Laws*, 87 A.L.R.4th 444 (1991). Defendant relies on *Rhone-Poulenc, Inc. v. International Ins. Co.*, 1997 WL 264299 (N. D. Ill., May 8, 1997) for the proposition that the policy is not ambiguous, but *Rhone-Poulenc* did not involve the same policy language at issue here and did not really require any differentiation between excluded clean-up costs and allowable property damage.

48

"Because the insurer prepares its own contracts, it has a duty to make the meaning clear. If the insurer intends to restrict or limit coverage under the policy, it must use clear and unambiguous language; otherwise, the policy will be liberally construed in favor of the insured." *American Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, 1058-59, 179 P.3d 1104 (2008). Given the language of the policy – including the modifier that "clean-up costs" refers to remediation-related expenses "to the extent required by environmental laws" – a reasonably prudent insured would understand the exclusion to mean the policy excludes coverage for the specified cleanup costs if they result *solely* from obligations imposed by environmental laws, but the exclusion does not otherwise limit or effect the policy's coverage for loss arising from property damage.[9]  Thus, if plaintiff has or had a legal obligation to compensate a third party property owner for physical injury to or diminution in value of their property (and to compensate for incidental damages), the Illinois Union policy would provide coverage for reasonable settlement of any such property damage claim based on that obligation.  And the reasonableness of such a settlement would depend on the extent of plaintiff's obligation to compensate the owner for property damage.  As the court's previous discussion indicates, the amount of damages recoverable depends upon the value of the property and the extent of restoration costs, with restoration cost damages generally available to residential home owners unless such costs are wholly disproportionate to the value of the property.  For non-residential property, such damages are generally limited to the pre-injury fair market value of the property.  Settlements of

---

[9] According to the Liberty policy, "'Environmental laws' means any legislatively or administratively enacted law, rule, regulation or order applicable within the jurisdiction in which the 'covered location' lies, pursuant to which the 'insured' has or may have an obligation to incur 'cleanup costs.'"

such property damage claims are within the purview of Illinois Union's coverage for property damage.  Beyond that, plaintiff's obligation to clean up property would arise from environmental laws, and the Illinois Union policy does not provide coverage if plaintiff incurred clean-up costs solely because of a governmentally-imposed clean-up obligation under environmental laws.  *Cf. Utica Mut. Ins. Co. v. Hall Equipment, Inc.*, 73 F.Supp.2d 83, 87 (D. Mass. 1999), *aff'd*, 292 F.3d 77 (1st Cir. 2002) (pollution exclusion precluded coverage for the costs of assessing, containing and removing the pollution, but not losses that are separate and distinct from environmental response costs, such as "permanent" property damages, diminution in fair market value of the property, loss of rental income, and loss of put-through income); *Central Illinois Light Co. v. Home Ins. Co.*, 213 Ill.2d 141, 821 N.E.2d 206 (2004) (a purely unilateral effort by an insured to clean up contaminated property may fulfill a statutorily mandated legal obligation, but the expenditures made do not constitute damages).

Plaintiff's affidavits on summary judgment include assertions that it paid various costs in settlement of property damage claims.  Some of those cost categories appear to clearly fall within the scope of Illinois Union's coverage, such as payments for: investigative and administrative expenses associated with claims adjustment, alternate living expenses, automobile damage, damage to personal property, bodily injury claims, purchase of oil-impacted residential and business properties, business interruption expenses, agricultural damage, and veterinary fees. Plaintiff concedes, however, that there are factual issues in the record as to the extent of such losses.

Plaintiff's affidavits also include assertions that it paid over $6.9 million "for demolition and removal of purchased structures" and over $15.9 million "for oil removal from or disposal of

impacted third-party property...."  The former sum was allegedly "a necessary adjunct to the

purchase program, to cost-effectively address the claims potentially assertable by claimants and

to insure that the purchased sites did not pose a continuing hazard to trespassers."  The latter sum

was allegedly to "remediate the damaged realty and settle the allegations made in the class action

complaints," and "[i]n part, these payments also satisfied the AOC [Administrative Order on

Consent] by preventing future damage."  Plaintiff's affidavits do not discuss the nature of the

property damage claims asserted against it, the specific damages sought, or the extent of

plaintiff's potential liability for property damage.  Nor do the affidavits make clear the

relationship of some of these costs to the settlement of plaintiff's liability for property damage.

Plaintiff's conclusory affidavits are insufficient to show as a matter of law that expenses paid for

demolition and oil removal costs were in fact paid in settlement of claims for property damage,

as distinguished from payment of obligations based on environmental laws.  To the extent any

costs were incurred solely to comply with the AOC or to address public health hazards, they

would appear to be clean-up costs excluded by the Illinois Union policy.  To the extent plaintiff

claims the costs were actually part and parcel of its settlement of property damage claims, it will

bear the burden at trial of demonstrating the nexus between property damage liability and those

costs, such as by citing proof – not merely a conclusion – that purchasing the properties,

demolishing the structures and remediating the property was a cost-effective way of settling

plaintiff's liability to third-party property owners on their claims.  On the current record, plaintiff

has not shown as a matter of law that these costs were incurred as part of the settlement of

property damage claims.  If plaintiff is able to demonstrate such a connection at trial, then the

sums would fall under the Illinois Union coverage.  On the other hand, if defendant Illinois

Union is able to show at trial that sums were paid solely because of environmental law obligations, such sums will not be covered by Illinois Union.  The same is true with respect to expenses associated with these costs, such as laboratory sampling and litigation support costs.

C. **National Union Commercial Umbrella Policy - Pollution Coverage**.  The National Union policy contains a qualified pollution exclusion endorsement.  Under that endorsement (No. 28 in Policy No. 9835018), pollution coverage is generally excluded but is provided if certain conditions are met, one of which is if the property damage resulted from a discharge or release of pollutants that "was abrupt and neither expected nor intended by the Insured."  Plaintiff contends the release from its refinery qualifies for coverage because it was unintended and "abruptly commenced with the storage tank overflow when unexpectedly severe and fast-rising flood waters rendered pipeline valves inaccessible."  Doc. 82 at 24.  Plaintiff notes that courts have construed similar provisions to mean an incident must be "sudden and accidental," and it argues the provision unambiguously provides coverage for the release of oil from the refinery.

*National Union Response*.  National Union argues there is a genuine issue of fact as to whether the release of crude oil from the refinery was "abrupt" within the meaning of the National Union pollution endorsement.  It says "abrupt" combines both the elements of without notice or warning and quick or brief in time.  Doc. 133-1 at 4.  It argues the evidence shows a genuine dispute because plaintiff "had advance notice and warning of the impending crude oil overflow [of] at least four to five hours, and as much as nine to ten hours, before the overflow started."  It further contends the release was not abrupt in duration, because it continued for several hours.  Additionally, the endorsement provides coverage only if the release was "neither

expected nor intended by the insured."  National Union maintains that property damage was

"expected" if the insured knew there was a high degree of probability or substantial certainty that

the damage would occur.  It cites evidence of plaintiff's knowledge of the oil flowing into Tank

8010, knowledge of the status of the tank, and knowledge that the tank would overflow if not

shut off, and argues "the trier of fact can not only reasonably infer that the Plaintiff knew the

crude oil release was highly probable but that the Plaintiff knew it was inevitable."

     *Discussion.*  A common form of qualified pollution exclusion allows coverage in the

event of a "sudden and accidental" release of pollutants.  *See e.g.*, 43 Am.Jur.2d Insurance §717.

Courts have divided on whether the term "sudden" is ambiguous, with some saying it is because

it could mean either "abrupt" in a temporal sense, or simply "unexpected" without regard to

time.  In *Hartford Accident & Indem. Co. v. U.S. Fidelity & Guar. Co.*, 962 F.2d 1484 (10th

Cir.), cert. denied, 506 U.S. 955 (1992), the Tenth Circuit rejected a claim of ambiguity under

Utah law, finding that "sudden and accidental" unambiguously means "temporally abrupt and

unexpected or unintended."  *Id.* at 1486.  The term "sudden," then, is synonymous with "abrupt,"

and it:

> has a temporal aspect as referring to the discharge of a pollutant
> abruptly, precipitately, or brought about in a short time.  It does
> not refer to actions which occur gradually over a period of time.
> The focus in determining whether the temporally 'sudden'
> discharge requirement is met is on the initial release of the
> pollutant, not on the length of time that damage to the environment
> continued as a result of the discharge, nor on the time span of
> eventual dispersal of the discharged pollutant in the environment.

43 Am.Jur.2d, Insurance § 717.

     As the parties point out, a number of cases decided under Kansas law employ similar

reasoning.  In *Federated Mut. Ins. Co. v. Botkin Grain Co.*, 64 F.3d 537, 541 (10th Cir. 1995),

the court said the term "sudden and accidental" is unambiguous and "has an objective temporal meaning referring to [] both the inception and duration of the pollution."  A similar holding in *U.S. Fidelity & Guar. Co. v. Morrison Grain Co., Inc.*, 999 F.2d 489, 493 (10th Cir. 1993) led the court to reject claims of coverage for a gradual dispersal of toxic chemicals that had been buried underground for a period of years or left inadequately stored in disintegrating buildings. In *Farm Bureau Mut. Ins. Co., Inc. v. Laudick*, 18 Kan.App.2d 782, 859 P.2d 410, 412 (1993), the court concluded that the term "'sudden and accidental' should be given a temporal meaning, that it is unambiguous, and that the meaning of the word 'sudden' combines both elements of without notice or warning and quick or brief in time." [citation omitted]. In *Cessna Aircraft Co. v. Hartford Acc. & Indem. Co.*, 900 F.Supp. 1489, 1511 (D. Kan. 1995), the court said that "[c]ontinuous, routine, or gradual discharges of pollutants are not 'abrupt' or 'quick' and thereby are not 'sudden' within the meaning of 'sudden and accidental.'" *(Citing Hartford Accident & Indem. Co. v. United States Fidelity & Guar. Co.*, 962 F.2d 1484 (10th Cir.), cert. denied, 506 U.S. 955 (1992)).  The court also pointed out that the burden was on the insured in such cases to show that the discharge of pollutants was sudden and accidental within the meaning of the exception to the pollution exclusion.  *Cessna Aircraft*, 900 F.Supp. at 1512.  That rule is in accord with the majority rule, and the court applies it here.

The National Union policy also required that the release be "neither expected nor intended by the Insured."  That clause is a variant of a common exclusion for "intentional acts" of the insured.  In *Thomas v. Benchmark Ins. Co.*, 285 Kan. 918, 179 P.3d 421 (2008), the Kansas Supreme Court addressed an automobile liability policy that covered "unexpected and unintended" events causing injury but which excluded injuries intentionally caused by the

insured.  At the time the injuries in *Thomas* occurred, the insured was fleeing from police and

was intentionally driving at an excessive speed.  The *Thomas* Court reviewed a number of

Kansas decisions finding similar conduct to be intentional under the maxim that a person intends

the natural and probable consequences of their actions.  The Supreme Court rejected that

approach, finding it too restrictive:

> A closely related problem with the natural and probable
> consequences approach for determining whether an injury was
> intentionally caused is its confusion with the concept of
> foreseeability: "[n]atural and probable consequences are those
> which human foresight can anticipate" or "should have been
> foreseen." [cite omitted.] If foreseeability of injury alone were
> enough to activate the policy exclusion, then many acts of mere
> negligence would be excluded. We should hesitate to read
> "intentional act exclusion" clauses to exclude both intentional and
> negligent acts, or else virtually all insurance coverage would be
> excluded. *Cf. Continental Western Ins. Co. v. Toal*, 309 Minn. 169,
> 176, 244 N.W.2d 121 (1976) (Defining exclusionary clause's
> "expected injury" as a foreseeable injury would have the effect of
> unduly limiting coverage under a liability insurance policy since
> foreseeability is generally an essential element in establishing
> liability. Foreseeability could include an injury resulting from
> simple negligence. Therefore, " 'an expected injury' as that term is
> used in an insurance exclusionary clause cannot be equated with
> foreseeable injury."); *cf. Poston v. U.S. Fidelity & Guarantee Co.*,
> 107 Wis.2d 215, 222, 320 N.W.2d 9, 13 (1982) (same) (If
> foreseeability of injury alone were enough to activate the policy
> exclusion, then many acts of mere negligence would be excluded.
> To so broaden the exclusion to exclude foreseeable injuries is
> unjustified.).

*Id*., 285 Kan. at 929.  Thus, under the "intentional act" or "intentional injury" exclusion test in

Kansas, "[t]he insured must have intended both the act and to cause some kind of injury or

damage.  Intent to cause the injury or damage can be actual or it can be inferred from the nature

of the act when the consequences are substantially certain to result from the act." *Id*. at 933.  *See*

*also Cessna Aircraft*, 900 F.Supp. at 1505 (under Kansas law, the term "neither expected nor

intended from the standpoint of the insured" is construed to provide coverage for an unintended injury resulting from an intentional act).

The court concludes that plaintiff's motion for summary judgment on this issue should be granted.  Even under defendant's version of events, the release of oil from plaintiff's refinery would have to be considered "abrupt and neither expected nor intended by the insured" within the ordinary meaning of those terms.[10]  The release at the refinery was not a gradual or recurring event over years, months, or even days; it developed and occurred within several hours.  There is no evidence that such a release was routine or commonplace, and it clearly did not occur during regular business operations.  *Cf. Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1529-30 (10th Cir. 1995).  *See also Fruit of the Loom, Inc. v. Travelers Indem. Co.*, 284 Ill.App.3d 485, 672 N.E.2d 278 (1996) (evidence showed that regular spills during manufacturing process were expected by the insured).  Defendant cites no comparable case where a one-time release over a span of several hours was held to be insufficiently "abrupt" under a qualified pollution exclusion.  *Cf. Federated Mut. Ins. Co. v. Botkin Grain Co.*, 64 F.3d 537, 542 (10th Cir. 1995) (several different spills over an extended period of time were not "sudden").  There can be no question that an unexpected flood, itself of unprecedented magnitude, required the emergency shutdown, leaving plaintiff little time to mull over the prospect of a release.  Plaintiff's initial concern – in addition to all the other details of the

---

[10] The court notes that the "abrupt and neither expected nor intended" condition in the National Union policy does not even apply "to a non-routine incident where such discharge ... was a result of an attempt by the Insured to mitigate or avoid a discharge ... that was itself abrupt and neither expected nor intended by the Insured and where substantial third party ... Property Damage could have occurred;..."  Although the latter clause arguably excuses the condition in this instance, the court need not determine that issue in view of its conclusion above that the condition was satisfied.

shutdown – was not that a storage tank might overflow, but the threat of a storage tank being dislodged from its foundation and rupturing in the flood waters.  To guard against that possibility – and the accompanying risk of a release – plaintiff worked to raise the oil level in Tank 8010, which it did for several hours.  It shut off the pumps pushing crude through the supply line to Tank 8010 in the early morning hours of July 1.  The evidence shows that plaintiff planned to shut the inlet valve at the tank, but in what could certainly be considered a case of negligent oversight, it failed to do so in time to prevent an overflow.

Defendant seems to rely on hindsight in arguing plaintiff knew to a substantial certainty the tank was going to overflow.  It would clearly be correct to say that plaintiff should have foreseen the possibility of a release and could have prevented it by acting with greater care.  But the same could be said of almost any negligent act causing an unintended injury.  A driver on a winding road knows to a substantial certainty that if he fails to turn the car at appropriate times, the car will run off the road.  If he negligently diverts his attention by trying to read a road map, thinking he will have time to adjust before the next curve, it would be fair to say the ensuing accident was foreseeable, but not that it was "expected or intended" by the driver.  Under the evidence cited, plaintiff's employees may have miscalculated or failed to appropriately consider the amount of time it would take for the tank to overflow.  Or employees in different locations may each have assumed the other would be able to shut off the flow of oil before the tank overflowed.  But there is no evidence that plaintiff acted with an expectation that an overflow was in fact going to occur, let alone with any such purpose in mind.  Defendant contends the release was "expected" because plaintiff "knew the crude release was *inevitable* if it did not take *immediate* and decisive action to shut off the valve in the east tank farm."  Doc. 133-1 (emphasis

added).  In support, defendant cites log records showing that between 12:30 a.m and 2:45 a.m., the tank level rose by more than four feet.  But this is not evidence of knowledge that an overflow was imminent.  There is no evidence that plaintiff's employees were even aware of this specific rise, but assuming they were, this rate of increase would have indicated to them that the tank was not likely overflow for at least six hours or more, until sometime after 8:00 a.m., leaving apparently ample time to shut down the flow.  It is true that employees must have known the tank would *eventually* overflow if oil continued to flow uninterrupted without being shut off.  But there is no evidence that they expected that to occur.  In fact, the uncontroverted facts show the contrary.  The evidence shows that plaintiff expected an employee to close the inlet valve at Tank 8010 in the early morning hours of July 1.  When the General Manager of the refinery, Keith Osborn, was informed at the 6:00 a.m. meeting that the employee could not reach the tank valve due to flood waters, he passed that information to the group in Bartlesville, hoping Bartlesville could close the valve at the East Tank Farm.  Due to a loss of power, however, that valve could no longer be closed remotely, and flood waters had rendered the East Tank Farm inaccessible by road.  It then took several hours to arrange a helicopter to reach the tank farm, the result of which was that technicians arrived after Tank 8010 had already begun to overflow.

This was a one-time release occurring during an emergency.  Plaintiff could obviously foresee that a release would occur if it failed to close the supply line, but there is no evidence that plaintiff "expected or intended" such a release to occur.  *Cf. Macklanburg-Duncan Co. v. Aetna Cas. & Surety Co.*, 71 F.3d 1526, 1539, n. 9 (10th Cir. 1995) (ongoing waste disposal over a period of years was not "sudden and accidental");  *Quaker State Minit-Lube, Inc*., 52 F.3d at 1527-28 (courts interpret the exclusion to preclude coverage for routine, gradual, or continuous

58

discharges of pollutants). The fact that plaintiff could foresee the possibility of a release is not enough to preclude coverage under the National Union endorsement. Under the uncontroverted facts, the court finds as a matter of law that plaintiff has shown the release was "abrupt and neither expected nor intended by the Insured."[11]

### D. National Union Pollution Coverage – Clean-Up Costs; Endorsement 28.

Plaintiff argues the foregoing finding necessarily means the National policy provides coverage for "all 'property damage' and all 'clean-up costs.'" Doc. 82 at 31. This argument is based on Endorsement 28, a "Time Element Pollution Self-Insured Retention Endorsement." Plaintiff argues a provision in the endorsement provides coverage for "third-party clean-up loss, cost or expense" whether or not such liability is also the subject of a "governmental request, demand, order or statutory or regulatory requirement." Id.

The National Union policy generally provides coverage for sums plaintiff becomes legally obligated to pay as damages because of property damage. A pollution exclusion in the body of the policy was replaced by Endorsement 28. Endorsement 28 initially provides that three items are excluded from coverage: 1) property damage from pollution; 2) clean-up costs from any governmental requirement; and 3) loss or expense from any governmental claims for

---

[11] National Union argues in a footnote that plaintiff "has not established as a matter of law that it took reasonable efforts to terminate the discharge as soon as conditions permitted," which is an additional condition in Endorsement 28 required for pollution coverage. Doc. 133-1, n. 2. The uncontroverted facts, however, support plaintiff's assertion that it made reasonable efforts to terminate the discharge once it occurred, which is what the condition requires. And defendant cites no contrary evidence to suggest that plaintiff failed to expend reasonable efforts to terminate the discharge as soon as conditions permitted.

clean-up.[12]  A subsequent qualification provides that paragraph 1 – the property damage

exclusion – will not apply if certain conditions are met, including that the release was abrupt and

unexpected.  The Endorsement subsequently sets forth a separate provision stating:

> "However, nothing contained in this endorsement will operate to
> provide any coverage with respect to: ...
>
> (iii) Any clean up loss cost or expense arising out of any
> governmental request, demand, order or statutory or regulatory
> requirement.  However, this provision iii will not apply to third
> party clean up loss, cost or expense otherwise covered by this
> endorsement that are also the subject of a governmental request,
> demand, order or statutory or regulatory requirement;..."

National Union challenges plaintiff's construction of the provision, saying the "plain

language ... reinforces the distinction in the Pollution Endorsement between 'property damage'

and response and remediation costs incurred to comply with governmental directives/orders and

statutory/regulatory requirements."  Doc. 127 at 31.  The "clarifying restriction" in subsection

(iii), according to National Union, "makes clear that the exclusion for governmental mandated

cleanup costs will not apply to damages a third party seeks to recover from Plaintiff to the extent

that the damage can be measured in terms of the cost to clean up the oil-damaged property."  *Id.*

Defendant contends the "otherwise covered" language "merely affirms that property damage can

be measured by the cost incurred by a third party to cleanup oil damaged property, even if there

is also an outstanding remediation order."  *Id.* at 33. In other words, defendant argues, the

---

[12] More particularly, paragraphs 2 and 3 exclude "[a]ny loss, cost or expense arising out
of any request, demand, order or statutory or regulatory requirement that the Insured or others
test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond
to, or assess the effects of Pollutants," or any loss or cost arising out of a suit of claim by a
governmental authority for damages because of such costs.  *See* Endorsement 28, Sec. V, Para.
Q, ¶¶ 2-3.

provision reflects the law of damages, but it "does not ... delete paragraph nos. 2 and 3 of the pollution exclusion such that Plaintiff may recover any and all response costs relating to the pollution release(s)."  *Id*. at 31.  Furthermore, defendant says, the provision is limited because it speaks only of *third party* costs, not costs to the plaintiff, and only applies to *cleanup costs*, which National Union contends are distinguishable from other costs related to pollution releases, including costs to test, monitor, contain, treat, detoxify, neutralize, and otherwise respond to pollutants.  *Id*. at 32-33.

Endorsement 28 is not a model of clarity.  The second sentence in subsection iii appears to restore coverage for "third party clean up loss, cost or expense ...."  Defendant notes that such costs are limited to those "otherwise covered by this endorsement," which according to defendant preserves the exclusions in paragraphs 2 and 3 for government-mandated cleanup, while also "clarifying" that property damage which can be measured by clean up costs is covered by the policy.  But subsection iii says nothing resembling that.  It does not mention property damage measured by clean-up costs; in fact it does not mention property damage at all.  And the exclusion in paragraph 2 apparently cannot be preserved in its entirety, because paragraph 2 and subsection (iii) both exclude clean-up costs arising from a governmental requirement, but (iii) says this "will not apply" to third party clean-up loss, cost or expense that is otherwise covered. Subsection iii comes under a provision that seemingly supersedes anything to the contrary in the endorsement (i.e, "However, nothing contained in this endorsement....").  The meaning of the provision is by no means plain and unambiguous.  After a series of exceptions and restorations – property damage is covered, but not it if is pollution damage, but it is if sudden and unexpected, but not for clean-up costs mandated by statute, but it is for third party clean-up loss or expense –

the coverage explanation is ultimately circular: "third party clean-up loss, cost or expense" is covered if it is otherwise covered.

It is possible to construe the provision as National Union suggests, as reconciling property damage coverage with the exclusion of government-mandated clean-up costs, allowing recovery of clean-up costs only when they are an applicable measure of property damage. *See* Doc. 127 at 33-34. *Cf. Clean Harbors Environmental Services, Inc. v. Boston Basement Technologies, Inc.*, 75 Mass.App.Ct. 709, 916 N.E.2d 406 (2009) (exclusion for government-required clean-up costs expressly provided that this "does not apply to liability for damages because of 'property damage' that the insured would have in the absence of such [governmental requirement].").  The court construed the Illinois Union policy in essentially that manner.  But the Illinois policy contained a comparatively straightforward exclusion of clean-up costs.  Even so, the court found that policy partially ambiguous.  Endorsement 28, by contrast, leaves far more unexplained than it explains.  No amount of parsing will yield a single reasonable interpretation of the policy's treatment of the clean-up expenses incurred by plaintiff as a result of the oil release and resulting damage.

The insuring clause of the National Union umbrella policy promises to pay sums in excess of the retained limit that the insured "becomes legally obligated to pay as damages by reason of liability imposed by law because of ... Property Damage."  Absent further definition, limitation or exclusion, a reasonable insured could understand that promise to mean coverage will be provided for all sums plaintiff is legally obligated to pay as a result of damaging someone else's property with pollution, including the costs of complying with statutory obligations to remediate the property. *Cf. Cessna Aircraft*, 900 F.Supp. at 1498, n. 9 ("The clear weight of

authority ... adopts the view that the undefined term 'damages' in CGL policies should be accorded its plain, non-technical meaning, thereby encompassing response costs imposed to remediate environmental damage.").  Endorsement 28 goes on to exclude coverage for property damage from pollution, but restores such coverage if certain conditions are met, including if the release was abrupt and neither expected nor intended.  The court has previously determined that the release meets this condition.  The Endorsement then goes on to exclude any government-mandated clean-up costs of the insured or others, but subsequently indicates such an exclusion "will not apply to third party clean up loss, cost or expense" if they are otherwise covered by the endorsement.  The endorsement does not clarify when clean-up costs are "otherwise covered;" it does not define the term "clean-up loss, cost or expense;" and it does not explain what is meant by "third party" clean up loss or costs.  Under the language of the policy, clean-up loss or costs could be considered "*otherwise covered*" if they fall under the general insuring clause for sums the insured becomes legally obligated to pay as damages because of property damage.  "*Clean-up* loss or costs" could refer to all costs necessary to lawfully clean up damaged property, including testing, monitoring, removing, and disposing of pollutants as required by law.  And "*third party* clean-up loss or cost" could refer to the costs of cleaning up property belonging to any third party, as opposed to loss to clean up property belonging to the government or the insured.

National Union may have intended this provision to merely clarify that clean-up costs can be an appropriate measure of property damage.  The test, however, is not what the insurer intended, but what a reasonably prudent insured would understand the language to mean. *Associated Wholesale Grocers, Inc. v. Amerigold Corp.*, 261 Kan. 806, Syl. ¶ 2, 934 P.2d 65

(1997).  Moreover, "[e]xceptions, limitations, and exclusions are narrowly construed because the insurer 'assumes the duty to define any limitations on that coverage in clear and explicit terms.'" *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 327, 961 P.2d 1213 (1998).  "It is not the responsibility of the insured to guess whether certain occurrences will or will not be covered based on non-specific and generic words or phrases that could be construed in a variety of ways...."  44A *Am.Jur.2d Insurance* §1965.  Reading the policy as a whole, a reasonably prudent insured could understand the policy to mean that when a pollution release covered by the policy results in a claim for damage to a third party's property, the policy will provide coverage to plaintiff for its cost of cleaning up that property[13] even if plaintiff's legal obligation to clean the property is based on a governmental order or statutory requirement.  The court concludes the policy is ambiguous as to whether it covers these types of clean-up costs, and the policy is therefore construed in favor of the insured to cover such costs.

Finally, National Union argues that the release of crude oil fractions from the "oily sewer system" at plaintiff's refinery (Doc. 127 at 26) came from a regulated waste treatment system, and therefore any resulting property damage is excluded from coverage.  This argument is based on a provision in Endorsement 28 stating that it does not provide coverage with respect to "Any site or location principally used by the Insured ... for the handling, storage, disposal ... or

---

[13] The court cannot accept defendant's additional argument that "clean up costs" are distinct from and much more limited than the "other response cost types" mentioned in Endorsement 28.  Doc. 127 at 32.  Paragraph 2 excludes any cost arising out of any requirement that the insured or others "test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of Pollutants;..."  Subsection iii later restores coverage for "third party clean up loss, cost or expense...."  To a reasonably prudent insured, the "clean up ... cost" would refer to all costs necessarily incurred to lawfully clean up the property, including testing, removing, treating, containing and disposing of pollutants.

treatment of waste material;..." The court must reject defendant's argument. The exclusion does not rule out coverage for a release from *any* waste-handling system of an insured. It only excludes a release from "a site or location principally used by the Insured ... for the handling, storage, disposal... of waste material." If defendant intended the provision to apply to pollutants from any waste-handling system, it could have drafted the exclusion in those broad terms. As it is, a reasonably prudent insured would understand the exclusion to apply to a site or location as a whole – in this instance the Coffeyville Refinery – and the principal use of that location.[14] No evidence is cited that the Coffeyville Refinery was principally used by plaintiff for waste handling, storage or treatment; in fact, the uncontroverted evidence shows otherwise. Defendant's attempt to apply the exclusion is therefore rejected. Additionally, the court rejects defendant's attempt to exclude coverage of the release of diesel oil from the refinery. Contrary to defendant's assertion, plaintiff has cited evidentiary support to show the cause of the release as well as uncontroverted evidence of the date when it occurred.

### E.  National Union CGL Umbrella Policy - "Drop Down" Coverage.

Plaintiff next argues the National Union policy provides "drop-down" coverage that applies if exclusions, sublimits or policy limit exhaustion prevents plaintiff's access to underlying insurance. "Upon exhaustion, reduction or exclusion of Illinois Union policy coverage," plaintiff says, "National Union coverage would drop down to indemnify Coffeyville Resources." *Id*. at 32-33. Plaintiff cites Paragraph G, Section IV of Endorsement 1, which provides in part that if the total applicable limits of Scheduled Underlying Insurance are reduced

---

[14] The court notes that the Liberty policy, a "Fixed Site Pollution" liability policy, contains an endorsement specifying eight separate locations, including the Coffeyville Refinery, to be "covered locations" under that policy.

or exhausted by payment of loss to which the National policy applies, and the total applicable

limits of applicable Other Insurance are reduced or exhausted, National Union will pay excess in

the event of reduction and will continue in force as underlying insurance in the event of

exhaustion.  Plaintiff maintains that drop-down coverage applies to clean-up costs because the

Illinois Union policy excludes such costs as well as any associated defense expenses.  It argues

that if Illinois Union prevails on its attempt to exclude clean-up costs, then any clean-up costs so

excluded would be covered by the National Union CGL policy.

National Union contends it has no duty to drop down.  It cites the provision stating that

the policy attaches in excess of the total applicable limits of Underlying Insurance and any

applicable Other Insurance.  Doc. 127 at 37.  It says plaintiff's argument about costs excluded by

the Illinois Union policy is misguided:

> The National Union policy expressly states that it attaches excess
> of, amongst other limits, all applicable Other Insurance.  If in fact
> the Illinois Union policy does not provide coverage for a particular
> cost, the Illinois Union policy would not constitute applicable
> Other Insurance for that cost.  However, Plaintiff has not
> established that [the] Illinois Union policy excludes coverage for
> any costs that are covered under the National Union policy.

*Id*. (record citations omitted).

<u>*Discussion*</u>.  With respect to any costs for property damage that are within the scope of

both the National Union and Illinois Union policies, the National Union policy clearly provides

that its coverage will be excess, and that it has no obligation to pay except in the event of

exhaustion of the Illinois Union policy.  This is express and implicit in several provisions of the

National Union policy, including the insuring provision stating that National Union will pay

sums in excess of the "Retained Limit," which is defined in part to include the limits of any

applicable Other Insurance providing insurance.  Paragraphs G and M of the Limits of Insurance, as amended in Endorsement 1, further clarify that National Union will drop down as underlying insurance in the event of exhaustion of the limits of applicable Other Insurance, and that the policy will pay only when applicable Other Insurance has been exhausted by the payment of loss.    The National Union policy is less clear about damages that fall within the scope of National's coverage but which are excluded from underlying coverage such as Illinois Union. As indicated above, National Union contends there are no such costs.  But in view of the court' s conclusion that the two policies treat clean-up costs differently, it is quite likely that the Illinois Union policy will exclude some clean-up costs – e.g., those unreasonably exceeding fair market values of affected properties – that will nevertheless fall within the scope of National Union's coverage.   National Union's brief does not fully address the effect of this; it merely states that in such circumstances the Illinois Union policy "would not constitute applicable Other Insurance for that cost."

The National Union insuring clause provides in part that it will pay on behalf of the insured "those sums in excess of the Retained Limit" that the insured becomes legally obligated to pay as damages by reason of liability imposed by law because of property damage.  The "Retained Limit" means:

> 1. the total applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance providing coverage to the Insured; or
>
> 2. the Self-Insured Retention applicable to each Occurrence that results in damages not covered by Scheduled Underlying Insurance nor any applicable Other Insurance providing coverage to the Insured.

Endorsement 28 further provides that in the event of a pollution occurrence, the Self-

Insured Retention will be $5 million for each occurrence, and this applies "whether or not there is any available ... Other Insurance."  Also, paragraph M.1. as modified by Endorsement 1 states that National Union will not make any payment under the policy until "any applicable Other Insurance [limits] have been exhausted by the payment of Loss...."

The "or" separating the two retained limit definitions above indicates they are alternatives, although the policy does not spell out the circumstances under which each applies. The first provision (No. 1) seems to apply when there is "any applicable Other Insurance" providing coverage to the insured.[15]  The Illinois Union policy is a valid and collectible policy providing coverage for damages covered in part by the National Union policy; it thus qualifies as "Other Insurance."  And the Illinois Union insurance is "applicable" at least to the extent that property damage coverage is concerned (but not with respect to clean-up costs excluded by that policy).  It has a $25 million policy limit.  To the extent provision No. 1 applies, then, the National Union coverage cannot be triggered until the $25 million limit of the Illinois Union policy is exhausted.  Moreover, the court agrees with National Union that its coverage duty is not triggered merely by a refusal on the part of Illinois Union to indemnify plaintiff.  As to property damage and other costs covered by both policies, then, National Union has no obligation to pay unless and until such exhaustion of the Illinois Union policy is established.

The second Retained Limit provision (No. 2) above apparently applies when there is an occurrence "that results in damages not covered by" any applicable Other Insurance.  *Cf. Fidelity & Deposit Co. of Maryland v. Hartford Cas, Ins. Co.*, 189 F.Supp.2d 1212, 1223 (D. Kan. 2002).

---

[15] No party has asserted that any of the policies listed in the National Union Schedule of Underlying Insurance are applicable.

Because the Illinois Union coverage of clean-up costs is more limited than National Union's, and the Liberty policy has now been exhausted, it is highly likely that there are some clean-up costs from this occurrence that are "not covered by applicable other insurance."  National Union concedes that as to any such costs, the Illinois Union policy would not be considered "applicable" other insurance.  As to such damages, then,  provision No. 2 indicates National Union will pay in excess only of the Self-Insured Retention.  The Self-Insured Retention is $5 million for covered pollution occurrences.  As to clean-up costs not covered by the Illinois Union policy, then, National Union's coverage is triggered by exhaustion of the $5 million Self-Insured Retention, not exhaustion of the Illinois Union policy limits.  Furthermore, as to clean-up costs excluded by the Illinois Union policy, the National Union policy is not excess because the former policy does not constitute "*applicable* Other Insurance."

This dual treatment of costs indicated by the National policy language is consistent with the typical nature and purpose of an umbrella policy.  Umbrella policies are ordinarily "designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage)."  *Yaffe Companies, Inc. v. Great American Ins. Co., Inc.*, 499 F.3d 1182, 1188 (10th Cir. 2007) (*citing Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd.*, 7 F.3d 1047, 1053 (1st Cir. 1993)).  In *Coleman Co., Inc. v. California Union Ins. Co.*, 960 F.2d 1529, 1530, n.1 (10th Cir. 1992), the court explained:

> Umbrella insurance generally provides two types of coverage. First, it provides standard excess coverage that attaches after a predetermined amount of primary coverage has been exhausted. An excess policy covering the same risks that are covered by the underlying policy is known as a "following form" policy. Second, an umbrella policy may provide broader coverage than the underlying policy in which case the umbrella policy will "drop down" and become primary.

69

(*Citing* Michael M. Marick, Excess Insurance: An Overview of General Principles and Current Issues, 24 Tort & Ins.L.J. 715, 717-19 (1989)).  And as noted in *Fidelity & Deposit Co. of Maryland*, supra, exclusions in an underlying CGL policy can result in the umbrella policy providing broader coverage than the underlying policy and give rise to a duty to "drop down" and provide coverage.

In sum, to the extent National Union and Illinois Union both provide coverage for particular costs, including reasonable settlements of property damage claims, the National Union policy is excess, and National Union has no duty to pay until exhaustion of the Illinois Union coverage is established.  As to clean-up costs excluded by the Illinois Union policy, however, National Union's coverage for such costs is not excess of the Illinois Union coverage, but is triggered by exhaustion of the applicable $5 million Retained Limit.


**F.  Business Interruption Expense**.  Although the Illinois Union policy excludes "any business interruption expense," the underlying Liberty defines that phrase in terms of interruption of the *insured's* business, not interruption of third party businesses.  Thus, plaintiff argues, the Liberty policy does not exclude liability for business interruption costs of others, and the Illinois Union policy likewise follows form and does not exclude such losses from third party businesses. Doc. 82 at 33-34.

In response, Illinois Union argues that for any businesses purchased by plaintiff and then demolished, the applicable measure of damages is based on diminution in fair market value and excludes compensation for any "loss of use."  Defendant concedes that for any third-party commercial buildings that were repaired rather than destroyed, compensatory damages might

70

include a reasonable amount to compensate for loss of use of the property while the repairs were being made, but it says plaintiff has not identified any such expenses, and argues plaintiff's motion for summary judgment is therefore premature and should be denied.  Doc. 121 at 26.

*Discussion*.  The underlying policy (Liberty) provided coverage for sums plaintiff was legally obligated to pay on pollution property damage claims.  "Property damage" was defined to include "all resulting loss of use, and diminution in value of that property;..."  The policy also provided separate "Business Interruption Caused by Pollution" coverage, which applied to business interruption expenses *incurred by the insured*, Coffeyville Refinery.  The Illinois Union policy stated in the Follow Form Limitation Endorsement that notwithstanding any provision in the followed (Liberty) policy, the Illinois Union policy does not apply to "Any 'business interruption expense' and any associated 'defense expense(s).'"  As noted above, Illinois Union concedes that for third-party businesses which suffered damage of a temporary character, "the third-party business interruption expense may qualify as compensatory damages on account of property damage."  It maintains, however, that third-party businesses suffering permanent property damage and/or for properties purchased by plaintiff, no compensation for "loss of use" is available.  Doc. 121 at 26.[16]

The court finds that business interruption expenses of third party businesses that suffered permanent damage or that were purchased by plaintiff may still qualify for coverage.  The Liberty policy defined "property damage" to include not only diminution in value but also "all

---

[16] "Business interruption expense" was defined in the Liberty policy to mean "'business income' and 'extra expense'; or 'delay damages.'" Illinois Union does not argue that the Follow Form Limitation Endorsement precludes liability coverage for business interruption claims of third party businesses.

resulting loss of use."  This shows an intent to provide "loss of use" damages even where the owner receives full compensation for diminution in the value of tangible property.  Where the property is permanently damaged or was purchased by plaintiff as part of a settlement, the third party business would be entitled to recover "loss of use" damages for a period from the initial interruption at least until the owner received payment for the pre-flood market value of the tangible property, which then theoretically provided the owner the means to resume business operations by purchasing an equivalent property.  The court will grant plaintiff's motion on this point insofar as it seeks a declaration that such expenses may be covered by the Illinois Union policy.

Because business interruption expenses of third party businesses may qualify for coverage under the Illinois Union coverage, the court need not address plaintiff's alternative argument that the National Union policy must drop down to cover such expenses if they are excluded from the Illinois Union policy.  *See* Doc. 82 at 35.  Any coverage under the National Union policy for such expenses would be excess of the Illinois Union coverage.

**G.  Additional Living Expenses**.

Plaintiff similarly contends coverage is available with respect to claims by residential owners for additional living expenses incurred because their property was not available due to pollution damage.  Illinois Union contends, as it did on business interruption damages, that no such damages can be recovered where the property damage was permanent.  It further says all of the residences that were the subject of plaintiff's Residential Purchase Program were purchased outright and demolished, such that additional living expenses do not come into play.  It argues the only measure of compensatory damages would be the difference between the property's

72

market value immediately before and immediately after the damage, and any living expenses or other "loss of use" expenses would not be compensable.

The court concludes, as it did above for "business interruption expenses," that additional living expenses can qualify for compensation under the "loss of use" provision of the Illinois Union policy. As indicated above, even when the property was permanently damaged and was ultimately purchased by plaintiff, damages for loss of use could be recovered for the period from the initial injury until the resident received payment for the injury to the property.

### H. K.S.A. § 65-6203 - Strict Liability.

Plaintiff says K.S.A. § 65-6203 imposes strict liability for damages caused by the oil release and for the cost of remediating the affected area. It argues this fact "serves to approve, if not mandate, the Residential Purchase Program ("RPP")" it undertook, because plaintiff concluded that restoration costs for the impacted residential properties were substantially greater than the purchase and demolition costs. Plaintiff says it therefore spent over $17 million to purchase over 320 residences at 110% of the pre-flood appraised value. Doc. 82 at 37. Plaintiff says that "[w]hile factual issues may remain as to the reasonableness or economic viability of the compensation and restoration activities undertaken by Coffeyville Resources, there should be no legal issues as to the inherent and all-encompassing liability of the defendant insurers to compensate Coffeyville Resources for those property losses and for those corrective and restoration measures required by K.S.A. § 65-6203." Doc. 82 at 38.

National Union contends the statutory obligation of K.S.A. § 65-6203 creates no coverage obligation on its part because the National Union Pollution Endorsement specifically excludes "loss, cost or expense arising out of ... statutory or regulatory requirements."

73

Moreover, it contends plaintiff has misinterpreted the statute, which defendant says applies only "to the property where the release or discharge took place, not properties where contamination may have subsequently migrated."  Doc. 127 at 36.

*Discussion*.  Kansas has a statute essentially imposing strict liability for accidental releases of harmful materials.  It provides in part:

> (a) It shall be the duty of any person responsible for an accidental release or discharge of materials detrimental to the quality of the waters or soil of the state to: (1) Compensate the owner of the property where the release or discharge occurred for actual damages incurred as the result of the release or discharge, or as the result of corrective action taken or access to take corrective action, if the release or discharge occurred without any contribution to the contamination and without any causal connection to the release or discharge by any action of the owner or owner-permitted occupant of the property; and (2) comply with all existing rules and regulations and requirements of the secretary of health and environment designed to ensure the prompt correction of any such release or discharge for the protection of the public health and environment.

K.S.A. § 65-6203(a).  Subsection (b) further provides that the owner or subsequent purchaser "of land, upon which there has occurred an accidental release or discharge," and who did not contribute to the release, shall not be liable for any costs of remedial action provided certain conditions are met, including that the owner allowed the responsible person and health officials reasonable access to the property and the Secretary of Health and Education has approved and certified the corrective action.

The court first concludes that plaintiff's duty under K.S.A. § 65-6203(a)(1) to compensate owners "for actual damages incurred as a result of the release" would constitute liability for compensatory damages arising out of property damage, such that plaintiff's settlement of landowner claims arising under 65-6203(a) is within the scope of property damage

coverage under the Illinois Union policy and, upon exhaustion of that policy, under the National

Union policy.  Moreover, the court rejects National Union's suggestion that the statute's

reference to "the property where the release or discharge occurred" refers only to plaintiff's own

refinery property.  Doc. 127 at 36.  Viewed in context, the phrase is naturally construed to mean

any property onto which harmful materials migrated or were dispersed in the course of a release

or discharge.  Nothing in the statute indicates an intent to limit its application to the legal

boundaries of the first parcel to be impacted.  Such a construction would make property lines

into artificial barriers while ignoring areas actually affected by the release of harmful materials.

The language of the statute discloses a remedial purpose to require responsible parties to clean

up all affected soils and water and to compensate land owners whose property is damaged by a

release or discharge.  The phrases "property where the release or discharge occurred" and "land

[] upon which there has occurred an accidental release or discharge" are not reasonably

construed to mean only the first property to be impacted.  They naturally refer to all property

onto which harmful materials migrated or were dispersed in the course of a release or discharge.

The obligation in 65-6203(a)(2) to comply with all rules and regulations to ensure prompt

correction of the release stands on a somewhat different footing.  Any remediation costs incurred

by plaintiff *solely* because of a governmental obligation and unrelated to any right of a property

owner to compensation would be excluded from the Illinois Union coverage by virtue of that

policy's clean-up cost exclusion.  But as discussed previously, the very same costs of

remediating the property could be covered by Illinois Union to the extent they constitute a

permissible measure of damages on a property damage claim.  As for National Union, its

coverage will be excess with respect to any such costs covered by the Illinois Union policy.  But

as to clean-up costs excluded by Illinois Union, National Union, upon exhaustion of the SIR, has

an obligation to cover such costs because a reasonable insured reading the policy could consider

these as "third party clean-up loss, cost or expense" that the insured is "legally obligated to pay

as damages by reason of liability imposed by law because of ... Property Damage."


### I.  Coverage Responsibilities of the Insurers.

On the basis of the foregoing, Coffeyville asks the court to declare the primary and

secondary coverage responsibilities of Illinois Union, National Union, and Westchester Fire as

they pertain to specific costs, expenses, damages and liabilities incurred by plaintiff as a result of

the release.  Doc. 82 at 38.  Plaintiff "requests partial summary judgment declaring the insurers'

payment obligations related to the following areas: i. General remediation obligations; ii. Real

estate damage; iii.  Personalty damage; iv. "Additional living expense" and "business

interruption"; and v. "Defense costs" and claim resolution activities.  *Id*. at 38-39.

As an initial matter, the court makes no findings regarding the coverage of Westchester

Fire, since no issues concerning that policy were briefed or properly presented for determination.

As to the various cost categories listed by plaintiff, the court has largely addressed them to the

extent possible in the foregoing rulings.  It is not entirely clear what declaration plaintiff seeks

regarding specific costs, since plaintiff recognizes that numerous factual issues remain

concerning damages, including issues relating to "the 'total loss' aspects related to P.I.K.3d

171.20, economies achieved by the RPP purchase/demolition methodology, the value of the

elimination of meaningful 'bodily injury' claims, and the subsequent value of the land

purchased."  Doc. 82 at 40.

i. Remediation obligations.  Plaintiff contends its settlement with Liberty was "intended to indemnify all 'clean-up costs' incurred by Coffeyville Resources," and that "all remaining expenses relate to property damage as defined within the policies...."  It argues that all of its oil removal and remediation expenses "were predicated on 'property damage'" and are covered under the policies.  Doc. 82 at 39.

ii. Real estate damage.  Plaintiff also contends Illinois Union should provide indemnification "for real estate oil contamination liability damages," and that upon exhaustion of that policy, National Union should continue to provide real estate property damage coverage.

The court has construed the policies with respect to property damage coverage and clean-up costs.  For the reasons previously stated, the court finds the Illinois Union policy excludes coverage for any sums paid by plaintiff solely because of governmentally-imposed obligations to clean-up pollution, but provides coverage for reasonable settlement of property damage liability claims, including settlement for any clean-up costs that are an appropriate measure of property damages.  For any such property damage costs falling within the scope of Illinois Union's coverage, National Union's coverage will be excess and will not be triggered unless the Illinois Union $25 million coverage is exhausted.  As to clean-up costs incurred solely based on government obligations, such costs are excluded from Illinois Union's coverage.  Such clean-up costs are within the scope of National Union's coverage, and its obligation for those costs is not excess of Illinois Union, but is triggered upon exhaustion of the $5 million SIR.

Both sides argue that the other bears the burden of proof at trial with respect to coverage or non-coverage of various losses.  The rule in Kansas, as it is nearly everywhere, is that the insured has the burden of proving the loss sustained was one that comes within the general

77

coverage provisions of the policy. *See Kansas Farm Bureau Ins. Co. v. Reynolds*, 16 Kan.App.2d 326, 328, 823 P.2d 216 (1991). This means the insured has the burden of proving both the nature and extent of any loss, and that the loss was caused by one of the perils covered by the policy. *Id.* But when the insurer seeks to avoid liability on the ground that the injury is covered by some specific exception to the general terms of the policy (i.e. an exclusion), the burden of proof rests with the insurer to prove the facts which bring the case within such specified exception. *Baugher v. Hartford Fire Ins. Co.*, 214 Kan. 891, 522 P.2d 401 (1974).

On the current record, the court is generally unable to make summary judgment determinations concerning specific costs or categories claimed by plaintiff. For example, plaintiff has provided a largely conclusory affidavit stating that no costs remain which are solely government mandated remediation. Plaintiff has not shown the basis for that conclusion or that it is beyond reasonable dispute. As such, the court will make no declaration concerning it. The affidavit further declares that there was no principled methodology available to allocate damage between flood and oil damage to residences. But plaintiff fails to adequately explain that conclusion, particularly since plaintiff was able to make a similar allocation with respect to personal property damage. Moreover, plaintiff concedes there are genuine factual issues concerning the cost-effectiveness of its residential purchase and demolition program. By extension, this means there are factual issues concerning the extent to which the costs allegedly "associated with" that program can be considered settlement of property damage claims within the scope of the Illinois Union and National Union policies or, alternatively, as clean-up costs excluded by Illinois Union and covered by National Union. Additionally, National Union cites an affidavit of J. Russell Dillon, a certified appraiser, who opines that plaintiff's evaluation of

78

the pre-flood fair market value of the residences purchased is overstated by a total of more than $1.1 million.  In sum, the record discloses a number of genuine issues of material fact concerning the extent of the loss claimed by plaintiff.

iii.  <u>Personalty damage</u>.  Plaintiff correctly points out that the National Union and Illinois Union policies both incorporate definitions of "property damage" that apply equally to personal property and real estate.  Thus, the court's conclusions regarding the respective coverage of these policies applies equally to personal property.

iv.  <u>"Additional living expense" and "Business Interruption" coverage</u>.  For the reasons previously stated, the court finds that the Illinois Union property damage coverage may apply to additional living expenses and business interruption damages of third parties to the extent plaintiff is able to demonstrate payment of such claims.

v.  <u>Defense costs and claims resolution activities.</u>  Plaintiff says it expended more than $3 million in administrative and legal costs associated with implementing and adjusting the RPP, with various other claims, and for "interaction with regulatory authority."  Doc. 82 at 42.  It contends these costs are compensable under the Illinois Union policy because the followed Liberty policy provided that covered "loss" includes "Defense expense."  It also contends such costs are covered by the National Union policy by virtue of several provisions, including its definition of "loss." *Id.* at 43.

Illinois Union "acknowledges this aspect" of the Liberty Surplus policy, but argues plaintiff has failed to recognize the exclusion for clean-up costs and "defense expense(s) associated with clean-up costs."  It contends "most of the costs made the subject of Coffeyville's coverage claim are clean-up costs," and "[i]t follows, therefore, that most of Coffeyville's

defense expenses are associated with clean-up costs and are therefore excluded." Doc. 121 at 27. National Union, meanwhile, denies responsibility for any defense or loss adjustment expenses, noting its Pollution Endorsement modifies the defense provisions to expressly exclude any defense obligation for pollution liability suits. Doc. 127 at 39. It argues plaintiff's reliance on the policy definition of "loss" is unavailing because the policy covers "damages," not loss. Moreover, even if these defense costs reduce the limits of the Liberty and Illinois Union policies, as plaintiff contends, National says they do not fall within the definition of "Loss" under the National Union policy because those other policies do not qualify as "Scheduled Underlying Insurance."

The Illinois Union policy clearly provides coverage for settlement of property damage claims as well as reimbursement for defense and claim resolution costs associated with such claims. But under the current record, plaintiff has not adequately established the extent of its "property damage" losses – or the defense and claim resolution costs specifically attributable to such claims – under the standards for property damage coverage discussed previously. Once the extent of property damage settlements and the extent of defense and adjustment costs attributable to such settlements are established by appropriate evidence, they will be within the scope of Illinois Union's coverage. Of course, under the Illinois Union policy exclusions, any defense and adjustment costs which defendant can show were attributable solely to "clean-up costs" within the Liberty definition will be excluded from Illinois Union's coverage.

As for the National Union policy, Endorsement 28 expressly and clearly provides that National Union "will have no duty to defend any Suit against the Insured" insofar as the pollution endorsement is concerned. While the negation of a duty to defend, standing alone,

does not necessarily mean the insured's defense expenses will not be indemnified, plaintiff has failed to cite any portion of that policy that can be reasonably construed as a promise to pay defense and administrative expenses in the absence of a duty to defend.  The policy generally promises to pays sums the insured becomes legally obligated to pay as "damages" because of liability for property damage.  The insured's own expenses in defending claims would not ordinarily be considered sums it is obligated to pay as "damages."  Plaintiff also relies upon the policy's definition of "loss," but as defendant points out, that provision only provides that defense or investigation costs are included in "loss" when they reduce the applicable limits of "Scheduled Underlying Insurance," and plaintiff does not contend that they do so here. Moreover, as noted above, the National Union policy promises to pay to pay for "damages," not for the insured's "loss."  The court also notes that the policy imposes a duty to defend in non-pollution property damage claims, and Section C of Defense Provisions states that if National assumes the defense of a suit it will investigate and pay various defense expenses.  But that provision is clearly inapplicable when National Union has no duty to defend and has not assumed the defense.  And the other references in the policy to payment of defense expenses are likewise entirely consistent with a promise to pay such expenses only when National has a duty to defend.  Finally, plaintiff notes that subsection iii of Endorsement 28 indicates coverage is provided for "third party clean up loss, cost or expense otherwise covered by this endorsement that are also the subject of a governmental ... order."  The insured's costs of defending such claims are not "otherwise covered" by the policy's coverage for property damage, however, nor would they be the subject of a governmental order.  In sum, nothing in the National Union policy promises to indemnify plaintiff's defense or investigative expenses when National Union does

81

not have a duty to defend under the policy.  National Union's motion for summary judgment on this point is granted.

### III.   <u>Illinois Union Motion for Summary Judgment</u> (Doc. 83).

Illinois Union's coverage applies only when there is a "claim" – i.e., a written demand – and it contends plaintiff has admitted there was no written demand for the majority of settlements it entered.  Doc. 84 at 2, 16.  Next, citing the "Follow Form Limitation Endorsement," it argues the Illinois Union policy does not cover clean-up costs.  *Id*. at 17.  It says most of plaintiff's expenditures (over $31 million) have been for clean-up costs and that none of those costs is covered by the Illinois Union policy.  *Id.*   The next largest component of costs, over $8 million, was expended as part of plaintiff's Residential Purchase Program.  Illinois Union says an as-yet undetermined portion of these payments is related to property damage covered by the policy – specifically a diminution in value from oil contamination – but a substantial portion of the diminution relates to flood water damage not covered by the policy.  Additionally, defendant argues the residual fair market value of the properties obtained by plaintiff must be excluded from loss, and that the 10% over fair market value paid by plaintiff was a voluntary payment rather than property damage.  Illinois Union argues "the vast majority" of the foregoing costs are not covered by the policy.  Moreover, it argues that both Kansas and Illinois law place the burden on the insured to segregate covered damages from non-covered damages, something plaintiff has allegedly failed to do.  "In fact, Coffeyville has not even established or determined the value of the properties it purchased as they stood immediately after the flood or in their current condition."  *Id*. at 32.  Until it does so, defendant argues, plaintiff is

not entitled to any of its purchasing costs.  *Id*.

Illinois Union further argues plaintiff has failed to identify covered damages in an amount high enough to exhaust the relevant sublimit of the Liberty Surplus policy (or the National Union policy).  It argues that in view of the Liberty $10 million sublimit for clean-up costs, plaintiff must show that it sustained $15 million in non-cleanup costs covered by that policy in order to exhaust the Liberty policy and to reach the attachment point for the Illinois Union policy.

Finally, as to any expenditures that may be covered by both the Illinois Union and National Union policies, Illinois Union contends plaintiff must first exhaust the National Policy before Illinois Union has any indemnity obligation.  *See* Doc. 84 at 33-35.  Illinois Union thus contends it is entitled to an order stating that it has no duty to indemnify plaintiff.

> *Discussion*.

The court has already addressed many of these arguments on plaintiff's motion for partial summary judgment.  The Illinois Union policy does in fact exclude clean-up costs, as Illinois Union argues, although the distinction between covered property damage settlements and excluded clean-up costs is not entirely clear.  And in conjunction with the exclusion, the Illinois Union policy provides coverage for settlement of property damage claims against plaintiff.  As a practical matter, this means the policy would cover settlements to the extent the law allowed a damage claim to a third-party property owner, supplemented by any allowable consequential damages suffered by the owner.  The extent of that liability depends in part upon the nature of the property, the nature of the injury, and the cost to remediate the property.  In some instances of property damage, the person responsible may be liable for remediation costs in excess of the

83

pre-injury fair market value of the property, as when the property is the personal residence of a third party, so long as those costs are not unreasonable or wholly disproportionate to the value of the property.  Plaintiff may be entitled to coverage under the Illinois Union policy to the extent it can show that it made payments to settle such property damage liability claims.  Illinois Union's coverage obligation will not extend to any expenses which defendant can show were incurred solely because of plaintiff's governmentally-imposed obligation to clean-up hazardous material and not because of an obligation to compensate the property owner.  As noted previously by the court, the current record discloses several issues of material fact – including the basis for plaintiff's liability for demolition and oil-removal costs and the connection of such costs to plaintiff's settlement of property damage claims.

The court rejects defendant's argument that it is entitled to summary judgment based on an alleged absence of written demands underlying the settlements.  As plaintiff points out, it was faced with more than one class-action complaint asserted on behalf of all individuals who sustained damage as a result of the oil release.  Regardless of the subsequent disposition of these cases, such claims constituted written claims against plaintiff, and notice of the claims was provided to defendant.  Additionally, the deposition testimony relied on by Illinois Union to establish plaintiff's alleged "admission" of the absence of written demands was itself equivocal, premised in part on a question asking the witness to "[put] aside any lawsuits," and limited by the witness's qualification that "to [his] knowledge" there was not a written demand *in every instance*.  Plaintiff has cited affidavit and deposition testimony supporting a finding that written demands were made.  The uncontroverted facts show that class action complaints were filed and that plaintiff initiated a settlement program in response.  Plaintiff has cited the affidavit of its

general counsel showing that the Pilot administrative center had 1,460 claims filed with it as of August 2007, all of which "were reduced to writing and made accessible to Illinois Union," and the files of which Illinois Union observed on-site "without comment or complaint."  Defendant's motion does not show as a matter of law that such demands submitted through Pilot were not "claims" within the meaning of the policy.  Illinois Union's motion for summary judgment on this issue is denied.

To the extent Illinois Union claims plaintiff has failed to show exhaustion of the Liberty Surplus policy – including an asserted failure to show it incurred over $15 million in "non-cleanup costs" – the court rejects that argument for reasons previously stated.  Illinois Union has not alleged or cited any evidence of bad faith in connection with Liberty's settlement for its policy limits, and plaintiff has cited uncontroverted evidence that the Liberty policy – including its $10 million sublimit and $25 million aggregate limit – has in fact been exhausted.  Defendant's motion for summary judgment on this issue is denied.

Finally, with respect to any costs covered by both the Illinois Union and National Union policies, the court concludes that the Illinois Union policy is triggered first, and that National Union's coverage of such costs is excess and triggered only after exhaustion of Illinois Union's coverage.  Accordingly, Illinois Union's motion for summary judgment on that issue is denied.

## IV.  **National Union Motion for Partial Summary Judgment (Doc. 141)**.

National Union has filed a further motion for partial summary judgment relating specifically to plaintiff's alleged defense costs and claims adjustment costs.  According to defendant, as of October 19, 2008, plaintiff claimed to have incurred just over $1.3 million in

litigation costs and approximately $5.4 million in claims adjustment costs.  National Union argues its policy expressly excludes any duty to defend plaintiff and does not otherwise indemnify plaintiff against these costs.   Defendant contends plaintiff does not actually challenge that fact, but plaintiff "has insinuated in other pleadings that because the National Union policy does not expressly *exclude* indemnification of legal defense or claims adjustment costs that those costs must therefore be covered."  Doc. 142 at 8-9.  National Union argues the policy only provides indemnification for sums that plaintiff is legally obligated to pay as damages because of property damage, and the ordinary meaning of the term "damages" does not include the costs incurred by the insured to defend, investigate or adjust claims.  *Id*. at 10.

For the reasons previously stated, the court will grant National Union's motion for partial summary judgment on this point.  The National Union policy does not promise to indemnify plaintiff for its defense and investigative expenses incurred in defending property damage claims.


## V.  <u>Summary</u>

1.  The Illinois Union policy coverage is triggered by exhaustion of the Liberty policy and the $1 million SIR applicable to the Liberty policy.  The uncontroverted facts show these events have occurred, and the Illinois Union policy is thus now primary coverage with respect to the release from the refinery.  With respect to property damage costs that are within the scope of coverage of both the Illinois Union and National Union policies, the National Union policy is excess, and is not triggered until all applicable coverage under the Illinois Union policy has been exhausted.

86

2.  The Illinois Union coverage for loss from property damage claims, when considered with that policy's exclusion of clean-up costs, would lead a reasonable insured to believe that the exclusion applies only to clean-up costs that result solely from obligations under environmental laws.  The exclusion does not otherwise limit or effect the policy's coverage for property damage settlements.  To the extent restoration or repair costs for property are an allowable measure of property damages, the Illinois Union policy provides coverage for reasonable settlement of property damage claims based on such costs, even if such restoration costs overlap with "clean-up cost" obligations under environmental laws.  Restoration costs are ordinarily an allowable measure of property damages if they do not exceed the pre-injury fair market value of the property.  In the case of residential property, such costs are allowable as damages in excess of fair market value so long as they are not "wholly disproportionate" to the value of the property.

3.  Several of the cost categories identified by plaintiff appear to fall within the scope of Illinois Union's coverage, including investigative and administrative expenses, alternate living expenses, automobile damage, damage to personal property, bodily injury claims, purchase of oil-impacted business and residential properties, business interruption expenses, agricultural damage, and veterinary fees.  There are genuine factual issues in the record, however, concerning the extent of such losses.

4.  With respect to plaintiff's claimed costs for categories such as demolition and removal of purchased structures ($6.9 million) and oil removal from or disposal of impacted property ($15.9 million), plaintiff has not shown as a matter of law that such costs were paid in settlement of claims for property damage, as distinct from payment of obligations under environmental laws.  Plaintiff bears the burden of showing more likely than not that payment of such costs

actually resulted from settlement of its property damage liability to third-party property owners on their claims.  The same is true with respect to expenses associated with those costs, such as laboratory sampling and litigation support costs.  To the extent plaintiff shows the requisite connection to settlement of property damage claims, the costs fall within the (now) primary coverage of the Illinois Union policy.

5.  The uncontroverted facts show that the release of crude oil from the refinery was "abrupt and neither expected nor intended by the Insured" within the meaning of the National Union policy.

6.  The treatment of governmentally-mandated "clean-up costs" under Endorsement 28 to the National Union policy is ambiguous, if not incoherent.  Because the policy's coverage for "damages" can reasonably be construed to include all clean-up costs incurred by plaintiff because of an obligation to remedy harm to third-party property, the ambiguous allowance for coverage of "third party clean-up loss, cost or expense" in Endorsement 28 will be construed to provide coverage to plaintiff for its cost of cleaning up third party property, even if its obligation to do so was based solely on a governmental order or requirement.  Additionally, plaintiff's release of crude oil fractions from its sewer system and its release of diesel oil are both within the scope of coverage under the National Union policy.

7.  With respect to "clean-up costs" that are within the scope of National Union coverage but excluded by the Illinois Union policy, National Union's coverage is excess only of a $5 million SIR.  Because there is no other applicable insurance to cover such costs, National Union is obligated, upon exhaustion of the $5 million SIR, to "drop down" and cover such costs.

8.  Illinois Union's coverage for loss from property damage includes third-party

88

"business interruption expense" and residential "additional living expense" paid by plaintiff in settlement of property damage claims.

9.  Illinois Union's coverage for loss from property damage includes any payments by plaintiff to settle claims of liability under K.S.A. § 65-6203(a)(1) for actual damage to property. With respect to settlement of any claim seeking clean-up of affected property pursuant to 65-6203(a)(2), Illinois Union's coverage will apply to the same extent set forth in paragraph 2 above.  To the extent any such costs are excluded under the Illinois Union policy, they will fall within National Union's "drop down" coverage set forth in paragraph 7.

10.  Plaintiff has not shown as a matter of law that none of its remaining costs are based solely on government-mandated remediation.  Moreover, summary judgment is inappropriate on the current record on several matters, including whether any allocation can be made to account for non-covered flood damage to real property, the cost-effectiveness of plaintiff's residential purchase program, the extent to which costs allegedly associated with that program are within the scope of Illinois Union's property damage coverage (or alternatively National Union's coverage of clean-up costs), and the appraisal of fair market values for pre-flood and post-flood properties.

11.  The Illinois Union policy provides coverage for plaintiff's defense and claims resolution costs associated with property damage claims.  The current record does not establish the extent of plaintiff's losses attributable to property damage, and thus does not show the extent of defense and adjustment costs owing under the Illinois Union policy.

12.  The National Union policy does not promise indemnification of plaintiff's defense and investigative expenses when National Union does not have a duty to defend.

13.  Illinois Union has not shown as a matter of law that there was no written demand, i.e.

"claim," underlying the property damage settlements made by plaintiff.

**VI.  <u>Conclusion</u>**.

National Union's Motions for Summary Judgment (Docs. 77 & 141), Coffeyville

Resources' Motion for Summary Judgment (Doc. 81), and Illinois Union's Motion for Summary

Judgment (Doc. 83) are GRANTED IN PART and DENIED IN PART as set forth in this order.

IT IS SO ORDERED this   <u>27th</u>   Day of April, 2010, at Wichita, Ks.


                                        <u>s/Wesley E. Brown</u>
                                        Wesley E. Brown
                                        U.S. Senior District Judge