**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

COFFEYVILLE RESOURCES REFINING )
& MARKETING, LLC, )
)
                Plaintiff, ) **CIVIL ACTION**
)
v. ) No. 08-1204
)
ILLINOIS UNION INSURANCE COMPANY; )
and NATIONAL UNION FIRE INSURANCE )
COMPANY OF PITTSBURGH, PA., )
)
                Defendants. )
                                       )

**MEMORANDUM AND ORDER**

Before the court are the following:

Coffeyville's Motion for Summary Judgment (Doc. 419,420);
National's Response (Doc. 428);
Illinois' Response (Doc. 425);

National's Motion for Reconsideration (Doc. 417);
Illinois' Joinder in the Motion (Doc. 418);
Coffeyville's Response (Doc. 421);
National's Reply (Doc. 422); and

National's Motion to Strike (Doc. 430, 431);
Illinois' Joinder in the Motion (Doc. 434);
Coffeyville's Response (Doc. 436);
National's Reply (Doc. 437);

**I. Plaintiff's Motion for Summary Judgment (Doc. 419).**

Plaintiff argues that Illinois breached a duty to defend it on the underlying claims and, as a result, forfeited any right to challenge plaintiff's settlements with third parties. It further argues that Illinois and National are precluded by waiver and estoppel from contesting plaintiff's settlements and claim resolution methods. Plaintiff contends the court should approve its remediation expenses in accordance with the coverage determinations made by Judge Brown and

should proceed to allocate coverage between the two defendants.

A. <u>Uncontroverted Facts</u>. The court finds the following facts to be uncontroverted for purposes of the motion for summary judgment.

On the evening of June 30, 2007, flooding from the Verdigris River reached plaintiff's oil refinery in Coffeyville, Kansas. On the following day, July 1, 2007, one of plaintiff's refinery tanks overflowed after plaintiff left a valve open and about 80,000 gallons of crude oil were released into the flood waters. The flood waters carried the oil into a portion of the town, causing widespread environmental contamination.

Plaintiff has incurred or will incur costs of over $58 million relating to the release. These include costs to investigate, contain, remove and remediate oil contamination, and to defend, adjust and resolve claims against plaintiff from the release.

At the time of the release, Plaintiff had insurance coverage under several policies, including the following. Liberty Surplus had in effect a policy which covered plaintiff for pollution legal liability, with an aggregate limit of $25 million. Illinois had in effect an excess policy covering plaintiff that followed form to the Liberty policy (with certain exceptions, including an exclusion for "clean up costs"), with an additional $25 million in pollution coverage. National had in effect a commercial umbrella liability policy, with general liability for certain types of pollution, providing $25 million of coverage per occurrence.

On July 5, 2007, Danny Dunham filed a putative class action in U.S. District Court for the District of Kansas (Case No. 07-1186-JTM), seeking damages from oil contamination on behalf of himself and a

-2-

class of plaintiffs similarly situated. On July 6, 2007, Western Plains Alliance filed a putative class action in the district court of Montgomery County, Kansas, asserting claims on behalf of all persons who owned property and all businesses within the area contaminated by the oil release.

On July 10, 2007, plaintiff executed an Administrative Order on Consent (AOC) with the Environmental Protection Agency to govern plaintiff's governmentally-imposed contamination removal and recovery responsibilities.

On July 16, 2007, plaintiff posted formal notices and made demand upon the insurers.

Illinois provided reservation-of-rights letters to plaintiff on July 24, 2007 (Doc. 371-7), July 24, 2007 (Doc. 371-8), and August 10, 2007 (Doc. 371-10). Among other things, Illinois asserted: that only Coffeyville Acquisition LLC was an insured under the policy; that plaintiff's planned purchase of residences was in lieu of non-covered "clean-up costs" that would otherwise be required and was therefore not "property damage" covered by the policy; that plaintiff's home purchase plan did not differentiate between uncovered flood damage and covered oil damage; that the extent "if any" to which the purchases may also constitute payments for property damage "has not been established"; and the Illinois policy could not be implicated until Liberty's $25 limit and plaintiff's $1 million self insured retention (SIR) had been paid.

On August 1, 2007, plaintiff responded to Illinois that the purchase plan payments were not for flood damage because the purchase plan was substantially cheaper and more effective (e.g., by reducing

-3-

additional property claims, bodily injury claims, and defense expenses) than would be a standard oil remediation of each property. In an August 10, 2007 response, Illinois noted plaintiff's request for immediate action but said it had not had sufficient time to assess the propriety of the plan. It also said it had not disclaimed coverage, but only retained its rights, and that it intended to work toward a prompt resolution of those claims that implicate the Illinois policy.

National issued reservation-of-rights letters on August 7, 2007 (Doc. 371-11), November 7, 2007 (Doc. 371-12), December 4, 2007 (Doc. 371-13), February 1, 2008 [to Liberty] (Doc. 371-14), and May 27, 2008 (Doc. 371-15). Among other things, National asserted: that it had no obligation to cover any clean-up costs incurred by plaintiff pursuant to the EPA Consent Order; that it had no obligation to provide coverage until the limits of both the Liberty and Illinois policies were exhausted; that National had no obligation to cover any payments made by plaintiff for claims of strict liability under K.S.A. § 65-6203 because such payments are excluded clean-up costs; that any payments by Liberty or Illinois would not reduce the $5 million SIR of the National policy; and that no payments for clean-up costs reduce the SIR under any circumstances.

On July 10, 2008, plaintiff filed its complaint in this action on July 10, 2008, claiming the defendants breached their contracts of insurance by refusing to indemnify plaintiff.

On August 21, 2008, the first Oil Pollution Act (OPA) case was filed against plaintiff. Over the next several years, a number of OPA and other cases were filed against plaintiff. Plaintiff settled a number of these cases.

-4-

On September 23, 2008, plaintiff settled its claim against Liberty. Pursuant to the settlement Liberty paid plaintiff a total of $25 million, the aggregate limit of its policy.

The Illinois policy continued in force as the primary coverage once the Liberty policy was exhausted. Illinois did not defend any claims brought against plaintiff and did not indemnify plaintiff in any manner.

On April 28, 2010, Judge Brown issued a Memorandum and Order on the parties' motions for summary judgment (Doc. 299). His findings included the following:

- The Illinois policy was triggered by exhaustion of the Liberty policy, with exhaustion occurring upon payment of the Liberty policy limits. The Illinois policy is now primary coverage with respect to the refinery release.

- With respect to property damage claims within the coverage of both the Illinois and National policies, the National policy is excess and is not triggered until all applicable coverage under the Illinois policy has been exhausted;

- The Illinois policy covers plaintiff's defense and claims resolution costs associated with covered property damage claims.

- The Illinois exclusion of "clean-up costs" applies only to costs resulting <u>solely</u> from obligations under environmental laws. To the extent the cost to restore property is an allowable measure of property damages, the Illinois policy covers settlement of such claims, even if the restoration costs overlap or are co-extensive with clean-up cost obligations under environmental laws. Restoration costs are ordinarily allowed as property damages if they do not exceed the (pre-injury) fair market value of the property. As to residential property, restoration costs may exceed fair market value so long as they are not wholly disproportionate to the value of the property.

- Illinois' property damage coverage includes payments by plaintiff to settle claims of liability under K.S.A. § 65-6203(a)(1) for actual damage to property.

- The release of oil was "abrupt and neither expected nor intended by the Insured" within the meaning of the National

-5-

> policy.

- The treatment of "clean-up costs" under the National policy is ambiguous. It will therefore be construed to provide coverage to plaintiff for the cost of cleaning up third party property even if plaintiff's obligation to do so was based solely on a governmental order or requirement.

- With respect to clean-up costs covered by National but excluded by Illinois, National's coverage is excess only of a $5 million SIR. The $5 million SIR has now been satisfied, meaning National is obligated to drop down and cover any such clean-up costs incurred by plaintiff that are not covered by the Illinois policy.[1]

- National does not have a duty to defend plaintiff and its policy does not promise indemnification of plaintiff's defense and investigative expenses.

- Summary judgment on the current record was inappropriate as to several issues, including: whether any allocation can be made to account for non-covered flood damage to real property; the cost-effectiveness of plaintiff's residential purchase program; the extent to which costs paid by plaintiff in connection with the purchase program are settlement of "property damage" covered by Illinois or, alternatively, "clean-up costs" covered by National; and the fair market values of affected properties.

From October 28, 2010, to the present date, neither Illinois nor National has provided indemnification for any of plaintiff's settlements or expenses relating to the release. Plaintiff has continued to expend money to resolve oil pollution claims, fines and penalties with the United States, and to complete remediation and payment of other obligations. To date, Illinois has provided no defense to plaintiff.

Within several weeks of the flood, attorneys Lee Smithyman and Edmund S. Gross began a series of telephone conversations and interactions with representatives of Liberty, Illinois and National

---

[1] See Doc. 311.

-6-

related to plaintiff's plans to settle oil pollution claims and undertake oil pollution remediation. The conversations included numerous aspects of claim resolution and oil remediation being employed by plaintiff. Among other things, the parties discussed the use of real estate appraisal teams, the Residential Purchase Program (RPP), the residential demolition methodology, and the strategies used to defend class action suits. During this period, plaintiff continued to provide the insurers with invoices for the oil release expenses it incurred, with periodic compilations in an Environmental Costs Database Summary.

Illinois and National seek among other things to contest the reasonableness of plaintiff's claims remediation and claims resolution expenses.

B. <u>Summary Judgment Standards</u>.

The rules applicable to summary judgment are well-known and are only briefly outlined here. Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim. <u>Adamson v. Multi Community Diversified Svcs., Inc.</u>, 514 F.3d 1136, 1145 (10th Cir. 2008). When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial-whether, in other words, there are any genuine

factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). If so, the court cannot grant summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

C. Discussion.

1. Whether the Insurers are Bound by Plaintiff's Settlements. Plaintiff first argues the defendants are bound by and cannot now challenge the reasonableness of settlements made by plaintiff. But the cases cited by plaintiff actually support the opposite conclusion: that in Kansas settlements made by an insured in these circumstances must be reasonable to bind the insurer. For example, in Waugh v. American Cas. Co., 190 Kan, 725, 733, 378 P.2d 170 (1963) the court held that where an insurer disclaims liability "the insurer is bound by any reasonable compromise or settlement made by the insured." (emphasis added). In Glenn v. Fleming, 247 Kan. 296, 318, 799 P.2d 79 (1990), the court said "a settlement may be enforced against an insurer in this situation only if it is reasonable in amount and entered into in good faith." See also United Wats, Inc. v. Cincinatti Ins. Co., 971 F.Supp. 1375 (D. Kan. 1997). In Associated Wholesale Grocers, Inc. v. Americold Corp., 261 Kan. 806, 833, 934 P.2d 65 (1997), the court reiterated that where the insured is forced to make a settlement on its own, the insurer's lack of consent does not preclude enforcement of the settlement agreement "if the amount is reasonable." Moreover, this reasonableness limitation applies whether or not the insurer breached a duty to defend the insured. Murphy v. Silver Creek Oil & Gas, Inc.., 17 Kan.App.2d 213, 837 P.2d 1319 (1992)

-8-

("the liability of an insurer as a result of an unjustified refusal to defend is not unlimited. It does not obligate the insurer to pay the amount of an unreasonable settlement or a settlement made in bad faith.").

Kansas law thus makes clear the insurer is responsible in these circumstances to the extent the insured made a reasonable settlement. And "[w]ithin the bounds of reason, the insured is free to enter into 'the best settlement possible' with the claimant.'" See Continental Cas. Co. v. Hempel, 4 Fed.Appx. 703, 716, 2001 WL 173662 (10th Cir., Feb. 22, 2001). But by the same token, the insurer can limit its responsibility by showing that the amount of the settlement was excessive given the insured's potential liability. Cf. 2 Allan D. Windt, Insurance Claims and Disputes, §6.29 (6th ed.) (the insurer "can deny liability only to the extent that the settlement amount was excessive in light of the facts known or reasonably available to the insured at the time of the settlement."). Illinois law is essentially the same. See Guillen ex rel. Guillen v. Potomac Ins. Co. of Illinois, 203 Ill.2d 141, 163, 271 Ill.Dec. 350, 785 N.E.2d 1 (2003); National Union Fire Ins. Co. of Pittsburgh, Pa. v. Continental Ill. Corp., 673 F.Supp. 267, 274 (N.D. Ill. 1987).

Under the framework of Glenn and Associated Wholesale Grocers, the insured, which has knowledge of the operative facts of the settlement, has the initial burden of demonstrating that the amount of the settlement was reasonable and entered into in good faith. The insurer then bears the ultimate burden of persuasion to show that the settlement was not reasonable or was not made in good faith. Glenn, 247 Kan. at 318-19.

-9-

Because an insurer is not barred in these circumstances from challenging the reasonableness of an underlying settlement by its insured,[2] plaintiff's motion for summary judgment on this point is denied.

2. <u>Estoppel and Waiver</u>. Plaintiff argues defendants are estopped from contesting plaintiff's "settlement and claim resolution methodologies." It contends the insurers were informed of all the relevant facts during periodic telephone conferences – including plaintiff's explanation that the RPP was more cost-effective than remediating the properties, as well as the reason for plaintiff's decision to pay 110% of fair market value – but the insurers remained silent and offered no alternatives as plaintiff implemented the plan. Plaintiff argues it was forced to take action and that it "had no choice but to rely on the Insurers' silence as approval of its plans." (Doc. 420 at 25). The result, it contends, is that the insurers should be estopped from contesting the reasonableness of the settlements.

In its reservation of rights letter of July 24, 2007 (Doc. 371-7), Illinois asserted that outright purchase of the damaged homes at 110% of value, as proposed by plaintiff, "would be in lieu of remediation and clean-up costs, [and therefore] would fall outside of" Illinois' coverage. It further stated the RPP did not differentiate between flood damage and oil-related damage, noted that Illinois had no liability for flood damage, and said any payment for flood damage would be voluntary and outside of Illinois' coverage. It said "[t]he

---

[2] The court went over this point extensively in its last order, Doc. 412 at 7-12, while acknowledging it may have erroneously suggested a contrary rule in previous dicta.

-10-

extent, if any, to which the purchases may also constitute" covered property damage "has not been established," and absent an agreement allocating damage "it is Illinois Union's position that the purchases represent clean-up costs inclusive of flood-damage repairs, and are therefore outside of the Illinois Union policy's coverage."

National, for its part, asserted that its policy did not cover any payments arising from the EPA Consent Order because they were cleanup costs; that it was excess of the Liberty and Illinois policies and was not obligated to pay until those policies were exhausted; and that its policy did not allow payments by Liberty or Illinois to reduce the applicable $5 million SIR.

The law recognizes there are situations when an insured may settle a claim independently and without the consent of an insurer. See 46 C.J.S. Insurance §1661 ("The insured is released from its agreement not to settle and has the right to make a reasonable settlement of the injured person's claim and recover the amount paid therein where the liability insurer unreasonably delays in taking any action after notice of the claim or where it breaches its contract by denying liability and refusing to defend or settle."). Illinois' reservation of rights effectively denied coverage for the RPP by claiming the purchase payments were in lieu of non-covered items.[3] National denied any coverage responsibility. Despite this – and as the

---

[3] An August 10, 2007 letter said Illinois "has not disclaimed coverage, but has merely reserved its rights." The same letter said Illinois needed more time and information to evaluate the RPP. The record discloses no subsequent modification of Illinois' position, however, leaving intact what was effectively a denial of coverage. Illinois does not dispute that to date it has provided no indemnification to plaintiff.

-11-

court has repeated now several times – an insurer's refusal to indemnify or defend does not preclude the insurer from later challenging the reasonableness of settlements made by the insured. See Waugh and Glenn, supra. Cf. Aselco, Inc. v. Hartford Ins. Group, 28 Kan.App.2d 839, 851, 21 P.3d 1011 (2001) (despite insurer's breach of duty to defend and failure to reserve its rights, estoppel did not prevent the insurer from arguing that the insured's loss was not covered).

Plaintiff makes essentially the same argument with respect to waiver, arguing an insurer's failure to timely object to a proposed settlement waives the right to object at a later time. Doc. 420 at 26 (citing Utah Power & Light Co v. Federal Ins. Co., 711 F.Supp. 1544 (D. Utah 1989)). Again, it is true that an insurer's failure to object can operate as a waiver (or estoppel) of the right to invoke a consent clause and certain other defenses. But in this case the insurers do not claim their lack of consent renders the settlements invalid under a consent clause. And Kansas and Illinois law both allow an insurer in these circumstances to argue that the amount of the settlement exceeded what was reasonable under the circumstances. Plaintiff's motion arguing that the insurers waived or are estopped from contesting the reasonableness of the settlements is therefore denied.

3. <u>Whether Illinois Breached a Duty to Defend</u>. Plaintiff seeks summary judgment that Illinois breached a duty to defend it as of September 23, 2008, when Liberty tendered a $15 million payment to reach its policy limits. In response, Illinois argues that its policy created no duty to defend and, in any event, it did not breach a duty to defend because plaintiff never requested a defense.

At the outset, the court observes that it cannot identify a failure to defend claim in the proposed pretrial order, nor (perhaps as a result) has Illinois raised the policy defense arguments presented in its response. Nevertheless, because they are raised, the court will discuss the issues but will withhold final ruling until the jury resolves the many questions pertaining to damages. If a trial is necessary to resolve the question of Illinois' failure to defend, whether it be a jury trial or a trial to the court, it will be a separate proceeding. See Fed. R. Civ. P. 42(b); Hampton v. Dillard Dept. Stores, Inc., 18 F.Supp.2d 1256, 1268 (D. Kan. 1998) ("The rule clearly suggests that a court may bifurcate a trial on its own motion"); In re Breast Implant Cases, 942 F.Supp. 958, 962-63 (S.D.N.Y. 1996) (Rule 42(b) allows court to sua sponte order separate trial of any issue for convenience, to avoid prejudice, or to further expedition and economy).

The Liberty policy contained a promise to defend plaintiff on any claims potentially within its scope. The Illinois policy, in turn, promised coverage in accordance with the terms of the Liberty policy "except as otherwise provided" and subject to the terms and conditions of the Illinois policy, with a promise to "continue in force as primary insurance" upon exhaustion of the underlying insurance. As the court indicated in a previous order, absent a clear statement otherwise these provisions could lead a reasonable insured to believe that Illinois was promising to defend plaintiff once the Liberty policy was exhausted. See Doc. 412 at 5.

Illinois disagrees, citing General Condition E and arguing that it unambiguously precluded any duty to defend. Condition E is entitled

-13-

"Claim Participation" and states that Illinois "shall have the right, but not the duty, and shall be given the opportunity to effectively associate with the Insureds in the investigation, settlement or defense of any Claim even if the Underlying Limit has not been exhausted." The provision clearly guarantees Illinois an opportunity to participate in the defense notwithstanding its status as an excess insurer. Cf. MBIA Inc. v. Federal Ins. Co., 652 F.3d 152, 167 (2nd Cir. 2011) ("The purpose of the 'right to associate' clause is to provide the insurer with an 'option to intervene' in the defense and settlement of a claim."). It does not say, however, that Illinois will have no duty to defend plaintiff <u>after</u> the underlying insurance is exhausted and Illinois becomes the primary carrier, which is the issue here. The condition has a disclaimer of sorts – Illinois "shall have the right, but not the duty, and shall be given the opportunity" – which could be understood by a reasonable insured as simply giving Illinois an option but not a duty to participate in the defense <u>prior</u> to exhaustion of the Liberty policy (i.e., "even if" the underlying policy has not been exhausted). Cf. 14 Couch on Insurance §200.38 ("As a general rule, a true-excess insurer is not obligated to defend its insured until all primary insurance is exhausted or the primary insurer has tendered its policy limits. An excess carrier may nevertheless voluntarily participate in the insured's defense but has [no] obligation to due so."). See also American Special Risk Mgmt. Corp. v. Cahow, 286 Kan. 1134, 1142, 192 P.3d 614, 621 (Kan. 2008) (if a provision is ambiguous, the insurance policy language is tested by what a reasonably prudent insured would understand the language to mean, not by what the insurer intended the language to mean).

-14-

Moreover, none of the reservation of rights letters cited by Illinois (Docs. 371-7, 8 and 10) identify General Condition E.

The ambiguity of this provision is emphasized by comparing it to the provision in <u>Newmont v. USA Ltd. v. American Home Assur. Co.</u>, 676 F.Supp.2d 1146 (E.D. Wa. 2009), cited by Illinois in its brief. The <u>Newmont</u> policy stated flatly that the insurer "shall not be called upon to assume charge of the settlement or defense of any claim made ... against the Assured...." Similarly, an endorsement in the National policy declared that "We will have no duty to defend any Suit against the Insured." There is no such unambiguous disclaimer in the Illinois policy.

The test for determining the intention of the parties is what a reasonable person in the position of the insured would understand the words to mean. <u>See</u> <u>First Fin. Ins. Co. v. Bugg</u>, 265 Kan. 690, 962 P.2d 515 (1988). Because the Illinois policy read as a whole can reasonably be construed as promising a defense after the Illinois policy becomes primary, the court concludes that General Condition E does not unambiguously relieve Illinois of any obligation to provide a defense after Liberty paid its policy limits. It is uncontroverted that Illinois took no steps to defend plaintiff on the claims arising from the release. Under the evidence presented, the court would be hard pressed not to conclude that Illinois breached its duty to defend plaintiff. The court agrees with Illinois' alternative argument that any breach could not have occurred until the Liberty policy was exhausted on September 23, 2008. <u>See</u> <u>Associated Wholesale Grocers, Inc. v. Americold Corp</u>., 261 Kan. 806, 830, 834, 934 P.2d 65, 81 (1997) ("Before National Union tendered its policy limits, [excess

carrier] NPIC was not obligated to defend [insured] or to take charge of settlement efforts on behalf of [insured]. * * * Here, NPIC's duty to defend began upon exhaustion of primary coverage.").

Illinois also argues that any duty to defend was not triggered because plaintiff "failed to produce any summary judgment evidence to establish whether and when it requested Illinois Union to provide a defense." (Doc. 425 at 16). Plaintiff formally tendered the claim to Illinois shortly after the release (including a notice that the damages could exhaust the limits of the underlying policy) (Doc. 371-2), and it thereafter kept Illinois informed as to claims being made and the claim settlement process. Plaintiff filed this action for breach of contract in July of 2008. In September of 2008, Liberty paid its policy limits and was dismissed from the case, a fact clearly known to Illinois. Judge Brown later ruled that the Illinois policy was next in line and that it was triggered by exhaustion of the Liberty policy. Illinois acknowledges that there are no Tenth Circuit or Kansas decisions which state that some sort of formal demand is necessary, nor has it identified any document which informed plaintiff that it was denying coverage due to the absence of a formal demand. Cf. 2 Allan D. Windt, Insurance Claims and Disputes, §4:1 ("In order to trigger an insurer's duty to defend, the insured need only put the insurer on notice of the claim, thereby at least implicitly tendering the defense. A formal demand is not necessary."). There is no question that Illinois was aware of the flood and the possibility, if not certainty, that plaintiff would be seeking coverage under the Illinois policy. Under these circumstances, an argument can be made that Illinois waived or is estopped from any "failure to demand" defense.

But the question of Illinois' breach of its duty to defend, and the ramifications of that breach, are in any event completely separate matters from the issues that will be presented to the jury concerning the reasonableness of the settlements made by plaintiff. Therefore the court will withhold further discussion and a ruling on this issue until after the jury trial.

    4. <u>Alternative Requests</u>. As an alternative to summary judgment, plaintiff asks the court to make several other determinations, including:

    (1) that all established claim settlements and expenses will be presumed reasonable by the trier of fact;

    (2) that the burden of proving any expense unreasonable will be on the insurers;

    (3) that the insurers are prevented by waiver and estoppel from arguing that any claims were for non-covered flood-related damage; and

    (4) that the trier of fact will determine whether the insurers waived or are estopped from contesting the reasonableness of settlements. (Doc. 420 at 31).

With respect to items (1) and (2), the court has already outlined the order and burden of proof. Plaintiff has the burden of coming forward with a prima facie showing that the settlements were reasonable. If it does so, the ultimate burden of persuasion will be on the insurers to prove the settlements were unreasonable. The court will decide at the time of trial whether the jury should be instructed on a presumption of reasonableness.

    As to items (3) and (4), the court has determined as a matter of law that waiver and estoppel do not prevent the insurers from

asserting that the settlements were unreasonable because they were excessive or included payment of non-covered claims. The trier of fact will not be allowed to find that estoppel or waiver prevents the insurers from challenging the reasonableness of the settlements.

**II. National's Motion for Reconsideration (Doc. 417).**

National moves "for reconsideration and/or clarification of certain conclusions" in the court's ruling on motions in limine. (See Doc. 412). The matter relates to Illinois' motion to exclude "any mention of, or evidence relating to, the settlement between [Plaintiff and Liberty] and the allocation of Liberty's settlement payment among coverage categories." (Doc. 373 at 2). The court took the motion under advisement. (Doc. 412 at 14). National asks for reconsideration or clarification because of the following additional comments by the court:

> At this point it is not clear to the court that the parties have thought through how the evidence regarding damages will be presented. Plaintiff's cost categories, which appear to be the only practical method of tracking the claims and payments stemming from the flood, are themselves tied to the policy provisions of the insurance policies. Plaintiff clearly developed the categories in conjunction with Liberty as the primary insurer on the claims.

(Doc. 412 at 14).

National "understands the foregoing to be in part the Court's preliminary thinking," but it "disagrees with the Court's apparent conclusion that Plaintiff developed the cost categories in conjunction with Liberty," and it brings the instant motion "to ensure that the Court's open reflections on this subject do not become entrenched

-18-

without the full presentation of evidence." (Doc. 417 at 2). National cites deposition testimony which it claims shows plaintiff developed the cost categories on its own without Liberty's involvement. It also seeks clarification of the court's statement that the cost categories are "tied to the policy provisions," because it says the categories were developed by plaintiff's counsel and "have an advocacy component to them ... [and] cannot be considered to be exclusively objective in nature."

The court doubts that dicta of this sort, even if based on an erroneous factual premise, rises to the level of "clear error" that justifies a motion to reconsider. See D. Kan. R. 7.3. At any rate, the fact that the court took the motion under advisement should have made it clear that no final decision was made. See also Doc. 412 at 1 ("nothing in this order will preclude the admissibility of the excluded evidence if it otherwise becomes relevant at trial," and "nothing said herein constitutes a final ruling admitting evidence to which a valid objection is made at trial."). Regardless of the origin of plaintiff's cost categories, the jury will have to hear this evidence in context to gauge its relevancy. At this point the court will simply say that in view of defendants' challenge to the reasonableness of settlements made by plaintiff, plaintiff – like defendants – will be given a full opportunity to explain its position to the jury.

But the court restates its concern regarding presentation of the case to a jury, i.e. how plaintiff plans to present its case, how Illinois and National propose to present their defenses and the parties' realistic and reasonable estimates of trial time. The court

will schedule a status conference in the near future to discuss and resolve these issues because it is now time to stop dispositive motion practice and prepare for trial of this aged case.

**III. National's Motion to Strike (Doc. 430).**

National moves to strike portions of an affidavit from Edmund Gross, which was cited by plaintiff in its summary judgment motion. In view of the court's disposition of the summary judgment motion, however, the issues raised by the motion to strike are moot. The motion is accordingly denied on that basis.

**IV. Conclusion.**

Coffeyville's Motion for Summary Judgment (Doc. 419) is DENIED; National's Motion for Reconsideration (Docs. 417) is DENIED; National's Motion to Strike (Doc. 430) is DENIED as moot.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 3 double-spaced pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>, 810 F.Supp. 1172, 1174 (1992). The response to any motion for reconsideration shall not exceed 3 double-spaced pages. No reply shall be filed. The court will not consider a motion for "clarification."

IT IS SO ORDERED.

Dated this 25th day of October 2013, at Wichita, Kansas.

s/Monti Belot

Monti L. Belot

UNITED STATES DISTRICT JUDGE